Jim AUSTIN and Aulemic, Inc.

v.

SERVAC SHIPPING LINE, LTD., Hassan A. Gaafar, Individually and Lexington Insurance Company.

Civ. A. No. B–83–436–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

June 6, 1985.

David S. Prince, Wayne Adams, Lorance & Thompson, William A. Durham, Eastham, Watson, Dale & Forney, Houston, Tex., for plaintiffs.

Daniel V. Flatten, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., Joel L. Hodes, Jonathan P. Nye, Whiteman, Osterman & Hanna, Albany, N.Y., for defendants, Servac Shipping Line, Ltd. and Hassan Gaafar.

H.S. Morgan, Jr., Richard L. Lagarde, Vinson & Elkins, Houston, Tex., for defendant, Lexington Ins. Co.

## MEMORANDUM OPINION

JOE J. FISHER, District Judge.

Plaintiffs, JIM AUSTIN and AULEMIC, INC., brought this admiralty suit against LEXINGTON INSURANCE COMPANY to recover for the loss of their vessel, the M/V Amazon Trader, which was insured under an American Institute Time Hull Policy issued by Lexington. Plaintiffs also sought statutory penalties for unfair claims handling practices in violation of

TEX.INS.CODE ANN. art. 21.21 (Vernon 1981).

Plaintiffs sued SERVAC SHIPPING LINE, LTD. and HASSAN A. GAAFAR, Individually, to recover for the breach of a charter party for the M/V Amazon Trader. Servac Shipping Line, Ltd. counterclaimed against Jim Austin, individually, for breach of the same agreement.

Both the charter party and insurance policy are maritime contracts within the admiralty jurisdiction of the Court. Because the charter and insurance contracts were both Texas contracts which were to be performed in whole or in part by the parties in Texas, the Court has *in personam* jurisdiction of the Defendants. Lexington's policy of insurance was issued to and is payable to Plaintiffs in Beaumont, Texas. The policy was, therefore, a Texas contract per Tex.Insur.Code Ann. art. 21.42 (Vernon 1981). The charter party was received and signed by Austin in Beaumont, Texas. Under the charter, Austin paid the monthly mortgage payments on the vessel to the Parkdale Bank in Beaumont. Servac was required to and Gaafar did report to Austin in Beaumont on the vessel's performance and made an offer for a long-term charter. The Court concludes that the Defendants were "doing business" in the state of Texas, within the meaning of art. 2031b, Tex. Rev.Civ.Stat.Ann. (Vernon 1964 and Supp. 1985).

The parties tried the case to the Court, sitting in admiralty. The Court heard the testimony of nineteen (19) witnesses, both live and by deposition. In addition, all parties submitted extensive pre-trial and posttrial briefs.

After careful review of the evidence, the Court finds and concludes that at all material times prior to June 16, 1982, the M/V Amazon Trader was seaworthy and reasonably fit for its intended use; that the damage to the vessel was caused by the negligence of the master and crew, which peril was insured under the insurance policy; and that Lexington Insurance Company has engaged in "unfair and deceptive acts or practices" in the handling of Plaintiffs'

claims in violation of TEX.INS.CODE ANN. art. 21.21. Consequently, judgment will be entered for Plaintiffs against Lexington Insurance Company.

The Court further concludes that Plaintiffs should take nothing by reason of their suit against Servac Shipping Line, Ltd. and Hassan A. Gaafar, and that Servac Shipping Line, Ltd. take nothing by reason of its counterclaim against Jim Austin.

## A. THE VESSEL

Jim Austin is the sole owner of Aulemic, Inc., a Cayman corporation having its principal place of business in Beaumont, Texas. Aulemic, Inc. bought the M/V Amazon Trader in December 1981. Aulemic had the vessel surveyed and refurbished, spending in excess of $200,000 to make it fit for transoceanic refrigerated cargo voyages. Extensive surveys by at least three marine surveyors found the vessel fit for duty and it was so certified. Among other things, the surveyors inspected certain of the devices which later failed at sea from misuse.

## B. THE CHARTER PARTY

In early May 1982, Hassan Gaafar, President of Servac, contacted Austin at his residence in Beaumont, Texas for the purpose of chartering the vessel to carry frozen cargo to Alexandria, Egypt from Tampa, Florida. Austin and Gaafar agreed to enter into a charter party and on June 2, 1982, Austin, on behalf of Aulemic, received and signed in Beaumont a charter party with Servac. Performance of the parties' obligations under the charter agreement was guaranteed by both Austin and Gaafar in their individual capacities.

In that charter party, Austin did not charge a freight rate or hire for use of the vessel. Instead, Austin entered the charter party so Servac could evaluate the vessel in anticipation of entering into a long-term charter. Under the charter party, Servac agreed to pay all expenses of the vessel during the charter from June 1st until the vessel returned to Tampa.

## C. THE INSURANCE POLICY

Plaintiffs' insurance broker, Frank B. Hall & Co. of Florida, placed hull insurance on the Amazon Trader on February 10, 1982 with Lexington Insurance Company. Lexington's policy of marine insurance was issued to Plaintiffs in Texas on July 1, 1982. Lexington insured Plaintiffs' vessel in the amount of $1,000,000 against loss and damage for the period from February 10, 1982 to February 10, 1983. Lexington had been instructed to name James D. Austin, the principal of Aulemic, Inc., as an additional insured and Parkdale Bank of Beaumont as mortgagee.

## D. THE VOYAGE

On June 13, 1982, the Amazon Trader sailed from Tampa, with a master and crew hired by Austin, on a round-trip voyage to Alexandria, Egypt carrying the cargo of Servac: many tons of frozen turkeys. The captain, David Ashbee, was qualified to serve as master of the vessel. His nine crewmen were qualified in their jobs and the Amazon Trader was properly manned, equipped and supplied and reasonably fit for the voyage to Alexandria, Egypt.

Three days out of Tampa the captain stopped the vessel's engine to repair a slipping clutch. The vessel was then located approximately 70 to 80 miles off the east coast of Florida and within its trading warranty. The chief engineer gave the Captain two options: Either call a seatug to take her back to port for proper repairs, or weld the clutch into a solid unit.

Captain Ashbee made a serious error in judgment by ordering the chief engineer to weld the clutch into a solid unit without first consulting the owner. The welding of the clutch caused a misalignment of the vessel's main engine power train. The continued operation of the vessel in that condition resulted in extensive damage to the vessel's main engine, clutch, thrust-bearing and tail shaft. In addition to the mechanical problems noted above, the vessel suffered a fire and its generators were damaged by contaminated fuel.

Ashbee knew the repairs to the clutch were temporary and that the chief engineer recommended proper repairs in the next available port. But he continued on to Alexandria because the Charterer's agent advised him "to continue to Egypt and in Egypt we'd have all the major repairs corrected when you discharge the cargo." Moreover, Gaafar gave Ashbee an arrival deadline before the vessel left Florida. The vessel arrived in Alexandria on July 15 and discharged its cargo.

Prior to the vessel's arrival in Alexandria, Plaintiffs received, in Beaumont, Servac's favorable evaluation of the vessel's performance and an offer for a long-term 30 month charter. Under this proposed charter party, Plaintiffs were to realize at least $13,000 a month clear net profit for the 30 months of the charter, resulting in at least $390,000 profit from the long-term charter of the vessel to Servac.

■ Before addressing the dispute with Lexington, the Court will dispose of the cross claims of Austin and Gaafar and of their companies. Both Austin and Gaafar allege breaches of their charter party agreement by the other's company. The Court concludes that it was the intention of the parties that Servac pay all expenses, including repairs to the vessel, incurred in shipping its product to Egypt. That was simply the consideration for using the vessel.

Because Servac actually paid the expenses of the vessel during the charter, the Court concludes that Gaafar and Servac did not breach the charter party.

■ Servac's allegations that Plaintiffs failed to exercise due diligence and breached the implied warranty of seaworthiness are without merit. The damages Servac seeks from Austin in its counterclaim, by the admission of Servac's President, Gaafar, are either related to an earlier charter party for which Servac indemnified Aulemic or are expenses incurred in operating the vessel.

■ Maritime law permits parties to assume liabilities in contracts as they choose.

*J.B. Effenson Co. v. Three Bays Corporation, Ltd.*, 238 F.2d 611 (5th Cir.1956). The Court concludes that Servac's position is contrary to the plain reading of the contract and to Servac's earlier course of action. Accordingly, the Court holds there was no breach by Austin.

## E. THE DAMAGE CLAIMS AND DENIALS

The balance of the lawsuit concerns the refusals of Lexington to pay claims under the marine insurance policy and its liability to Austin for its failure to pay claims.

### 1. THE AUGUST 1982 DAMAGE CLAIM AND DENIAL

On August 3, 1982, Austin reported to Frank B. Hall & Co. two claims for main engine damage and a fire which occurred on the vessel while en route from Florida to Egypt. Frank B. Hall & Co. immediately notified Lexington of the two claims under the policy. The policy contained a trading warranty which insured the vessel only while within the Western Hemisphere. Lexington refused to pay, insisting that Aulemic breached that warranty and thereby voided the coverage.

The Court finds that all the damage to the Amazon Trader occurred in the Western Hemisphere and within the vessel's trading warranty. The Court further finds that Lexington failed to conduct a reasonable investigation under the circumstances and summarily denied both claims on August 4, 1982. Frank B. Hall & Co. advised Lexington on August 5, 1982 that the main engine damage occurred within the vessel's trading warranty, as stated in the policy, but Lexington continued to deny coverage and closed both claims files on August 23, 1982.

Among other perils insured by Lexington in the policy were those contained in the "Inchmaree" clause, which provides in part: "Subject to the conditions of this policy, this insurance also covers loss of or damage to the vessel directly caused by the following: Negligence of Masters, Officers, Crew or Pilots, provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the vessel, or any of them." The Court finds and concludes that the damage to the Amazon Trader fell within the Inchmaree Clause of the insurance policy issued by Lexington.

### 2. THE OCTOBER 1982 DAMAGE CLAIM AND DENIAL

While in port in Alexandria, the Amazon Trader underwent repairs to a rear shaft bearing. Captain Ashbee knew the repairs were only temporary and that the vessel required major repairs to the main engine, clutch, thrust-bearing, tail-shaft and generators. In September, 1982, the vessel was moved to Malaga, Spain for complete repairs. Frank B. Hall & Co. again notified Lexington of Plaintiffs' claims. In October, 1982, Austin inspected the vessel with the owners of two similar vessels. The vessel owners estimated the reasonable cost of repairs to be $400,000. Frank B. Hall & Co. made demand in that amount on Lexington. Lexington continued to deny Plaintiffs' claims and failed to provide Plaintiffs a reasonable explanation of the basis in the policy, in law, or in fact for the denial of the claims.

### 3. THE FEBRUARY 1983 SURVEY AND DENIAL

In January, 1983, Plaintiffs employed a marine surveyor, Percy Overman, to conduct a damage survey. In his damage survey report, Overman concluded that the reasonable cost of repairs to the Amazon Trader was $373,600. Lexington's surveyor from the Salvage Association, John Riley, initially agreed the damage was caused by crew negligence and so stated in his survey report dated February 9, 1983. Despite this information, Lexington continued to deny Plaintiffs' claims and refused to approve a shipyard for repairs. In late February, 1983, Lexington was advised that because Plaintiffs' claims were being denied, Plaintiffs would be forced to sell the vessel in its distressed condition. Plaintiffs sold the Amazon Trader, unrepaired, on April 12, 1983 for $30,000 in mitigation of their damage.

As a result of Lexington's failure to conduct a reasonable investigation and to properly and fairly handle the claims, Plaintiffs incurred $109,748.88 in expense for crew wages, port expenses, agents, inspections and costs while seeking repair approval from Lexington and prior to the sale of the vessel. In addition, Plaintiffs sustained $390,000 lost profits on the long-term 30 month charter of the vessel to Servac. The Court finds that Plaintiffs would have earned these profits, had Lexington authorized and paid for the necessary repairs on a timely basis.

## F. COVERAGE UNDER THE POLICY

Lexington denies coverage of the Amazon Trader, claiming the vessel was unseaworthy at the attachment of the policy and upon its departure from Key West and Tampa because Plaintiffs failed to exercise due diligence to prepare the vessel; because the master and crew were unqualified; and because Plaintiffs misrepresented the nature of the risk insured.

■ The law presumes that every vessel is seaworthy until the contrary is proved, and the burden of proving that a vessel is unseaworthy lies upon the insurance company. *Hanover Fire Insurance Company v. Holcombe*, 223 F.2d 844 (5th Cir.1955).

■ A shipowner's obligation under a hull policy is extremely limited. The vessel must be seaworthy at the attachment of the insurance, but henceforth, the seaworthiness obligation is a sort of negative warranty, i.e. the owner or those in privity with him must not fail to exercise due diligence and send the vessel to sea in a deficient condition. *Tropical Marine Products, Inc. v. Burmingham Fire Insurance Company*, 247 F.2d 116 (5th Cir.1957), *cert. denied*, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957).

■ A shipowner's warranty of seaworthiness is not that a vessel shall continue absolutely to be kept in a seaworthy condition, or even that she be so at the inception of each voyage or before departure from each port during the policy term. *Sas-*

*katchewan Government Insurance Office v. Spotpack, Inc.*, 242 F.2d 385 (5th Cir. 1957).

■ Although the Inchmaree Clause of a hull policy refers to "due diligence" of the owner to keep the vessel seaworthy, it was not intended as a restriction of coverage, but was intended to broaden coverage in response to the practical business needs of the shipping world in the face of adverse court decisions. *Id.* at 391. *Tropical Marine Products, Inc. v. Burmingham Fire Insurance Company*, 247 F.2d at 122 (5th Cir.1957). An Inchmaree Clause does in fact underwrite unseaworthiness of many types, such as that occasioned by the negligence of the master or that resulting from a latent defect in hull or machinery. *Id.* at 123.

■ The Court concludes that Plaintiffs exercised due diligence and that the Amazon Trader was in a seaworthy condition and reasonably fit for its intended use at all material times prior to June 16, 1982. The vessel was properly manned with a qualified master and crew. Contrary to Lexington's allegation that the nature of the risk was misrepresented, the Court concludes that Lexington knew who and what it was insuring. Lexington has failed to sustain its burden on any contention to vitiate coverage. The Court finds therefore that the policy was in effect and provided coverage for the loss under the Inchmaree Clause. The damage to the Amazon Trader occurred in the Western Hemisphere and within the vessel's trading warranty. Plaintiffs are entitled to recover for all damage sustained by the vessel as a result of the master's and crew's negligence.

## G. APPLICATION OF TEXAS LAW

■ The Supreme Court has ruled that state law should be applied in the field of marine insurance, at least where entrenched Federal precedent is lacking, with respect to a specific issue. *Wilburn Boat Company v. Fireman's Fund Insurance Company*, 348 U.S. 310, 75 S.Ct. 368, 99

L.Ed. 337 (1962). As a Texas contract, the insurance policy is governed by Texas law, including all pertinent provisions of the Texas Insurance Code. Article 21.21, sec. 16 of the Code provides that a cause of action for treble damages may be brought by any person who has been "injured" by another's acts and conduct amounting to "unfair and deceptive acts or practices" in the business of insurance as declared in the lawfully promulgated rules and regulations of the State Board of Insurance. *Royal Globe Insurance Co. v. Bar Consultants,* 577 S.W.2d 688 (Tex.1979).

Plaintiffs sought relief under Sec. 16 of art. 21.21 for violations of Insurance Board Order 41060 Sec. .003 and .003(b) and argued that Lexington "engaged in unfair and deceptive acts or practices" in the handling of its claims, in violation of Sec. 3(i) and 3(*o*) of Insurance Board Order 27085. Plaintiffs also argued that Lexington violated Insurance Board Order 41060 Sec. .004(4).

The Texas State Board of Insurance previously adopted Board orders which prohibited, *inter alia,* misrepresentation of an insurance policy and unfair claim settlement practices, the latter including failure to reasonably explain a claim's denial and refusal to pay claims absent a reasonable investigation. Board Orders 41060 (July 22, 1982), 27085 (May 17, 1974).

The Court concludes that Lexington has violated Insurance Board Order 41060 Sec. .003 by committing "unfair and deceptive acts or practices" in violation of Sec. 3(i) and 3(*o*) of Insurance Board Order 27085. Lexington's wrongful denial of Plaintiffs' claims on August 4, 1982 and thereafter was based its failure to conduct a reasonable investigation. Lexington knew or could have learned that the loss occurred in the Western Hemisphere and within the confines of the vessel's trading warranty, yet persistently insisted there had been a breach of that warranty which voided coverage. Lexington has also violated Insurance Board Order 41060 Sec. .003 by its misrepresentation of the insurance policy, which amounts to "unfair

and deceptive acts or practices" in the business of insurance. The Court further concludes that Lexington has violated Insurance Board Order 41060 Sec. .004(4). Plaintiffs have been "injured" by Lexington's egregious conduct and are entitled to recover damages resulting from Lexington's violations of art. 21.21 Sec. 16 and the above-noted rules and regulations of the Texas State Board of Insurance.

■ Having determined that there was coverage for the loss and that Lexington has violated TEX.INS.CODE ANN. art. 21.-21, the Court must now ascertain Plaintiffs' damages. It was undisputed that if repairs had been carried out in Malaga, Spain on the Amazon Trader, the sound market value of the vessel would have been $480,000. The vessel was sold unrepaired for $30,000 less Plaintiffs' survey cost of $9,578 resulting in a depreciation in value of $459,758. The testimony of Plaintiffs' surveyor, Percy Overman, established the reasonable value of repairs was $373,600. The Court concludes that Plaintiffs are entitled to recover $373,600 minus the policy deductible of $12,500, for a total of $361,-100. Plaintiffs are also entitled to the return of unearned layup premiums of $6,492 for the four consecutive 30 day periods the vessel was in Malaga not under repair. Plaintiffs are therefore entitled to recover the sum of $367,592 under the policy, with prejudgment interest on this sum from the date of the denial of Plaintiffs' loss, August 4, 1982.

Plaintiffs' actual damages caused by Lexington's violations of TEX.INS.CODE ANN. art. 21.21, however, go beyond the mere costs of repairing the vessel, owed under the policy. As a direct result of Lexington's "unfair and deceptive acts or practices" in the handling of their claims, Plaintiffs incurred $109,749 in expenses for crew wages, port expenses, agents, inspections and costs while seeking repair approval and in the sale of the vessel. Moreover, Plaintiffs undisputably lost $390,000 by being unable to contract for the long-term charter of the vessel to Servac. That loss of profit was proximately caused by Lex-

ington's violations of Article 21.21. To the above amounts must be added the costs of repair payable under the policy: $361,100.

The Court finds that Plaintiffs' actual damages caused by Lexington's violations of the Insurance Code total $860,849. Plaintiffs are entitled to receive, the Court concludes, punitive damages three times that amount: $2,582,547. Plaintiffs may also recover reasonable attorneys' fees and costs of court.

## CONCLUSION

In summary, the Court concludes that there was coverage under the policy for the damage to Plaintiffs' vessel and that Plaintiffs are entitled to recover the reasonable cost of repairs and statutory penalties caused by Lexington's violation of TEX. INS.CODE ANN. art. 21.21. It is therefore

ORDERED, ADJUDGED and DECREED that judgment be entered for Plaintiffs, JIM AUSTIN and AULEMIC, INC., against Defendant, LEXINGTON INSURANCE COMPANY, in the sum of $367,592 for amounts owed under the insurance policy, plus prejudgment interest of ten percent (10%) of said sum, accruing from August 4, 1982; and $2,582,547 in punitive damages for Lexington's violations of TEX.INS.CODE ANN. art. 21.21. Plaintiffs shall also recover reasonable attorney's fees and costs of court. The parties will be expected to stipulate the amount of attorney's fees, but not that said attorney's fees are recoverable, and advise the Court within fifteen (15) days from the date of entering of this Memorandum Opinion. If the parties cannot agree, the Court will determine the amount. Interest on the judgment shall accrue at the rate of 9.15% from this date until paid in full.

It is further ORDERED, ADJUDGED and DECREED that Plaintiffs JIM AUSTIN and AULEMIC, INC. recover nothing against the Defendants, HASSAN A. GAAFAR, individually, and SERVAC SHIPPING LINE, LTD., and that Defendant SERVAC SHIPPING LINE, LTD. recover

nothing against Plaintiff JIM AUSTIN, individually.