Jim AUSTIN and Aulemic, Inc.,
Plaintiffs-Appellees,

v.

SERVAC SHIPPING LINE, Hassan A.
Gaafar, Ind., and Lexington
Insurance Co., Defendants,

Lexington Insurance Co.,
Defendant-Appellant.

No. 85–2462.

United States Court of Appeals,
Fifth Circuit.

July 2, 1986.

Rehearing Denied Aug. 4, 1986.

H.S. Morgan, Jr., Vinson & Elkins, R. Jeffrey Coppock, Houston, Tex., for defendant-appellant.

David S. Prince, Houston, Tex., for plaintiffs-appellees.

Before CLARK, Chief Judge, JOLLY and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Defendant Lexington Insurance Company (Lexington) appeals a judgment entered against it following a bench trial. Lexington presents several arguments calling for a complete reversal and the entry of a take-nothing judgment and several additional alternative arguments calling for a reduction of the damages assessed against it. While we reject the arguments calling for a complete reversal, we accept several of the damage reduction arguments and therefore order the damages reduced accordingly.

## I. BACKGROUND

Plaintiffs Jim Austin and his wholly owned corporation, Aulemic, Inc., (collectively Austin) purchased the AMAZON TRADER, a refrigerated freight ship, at a United States Marshal's auction in December 1981 for $125,000. After completing some repair and maintenance work, Austin agreed to a short-term charter party with Servac Shipping Line, Ltd. and its principal, Hassan Gaafar, (collectively Servac) so that Servac could evaluate the suitability of the vessel for its long-term charter needs. Austin obtained a $1,000,000 marine hull insurance policy with Lexington covering the AMAZON TRADER. During the period the policy was in force, pursuant to the short-term charter party, the AMAZON TRADER carried a Servac cargo from Tampa, Florida, to Alexandria, Egypt.

While enroute from Tampa to Alexandria, the ship suffered engine, power train, and generator problems. Austin, through its agent Frank B. Hall & Co. (Hall & Co.), an insurance broker, contacted Lexington about the ship's mechanical problems and

requested coverage. Lexington initially rejected the claim as occurring outside the vessel's trading warranty, which included only the Western Hemisphere, but Lexington later undertook a determination of the amount of the damages. One year after the claim arose the parties still could not agree on the cost to repair the vessel; consequently, Austin brought suit against Lexington, alleging failure to pay claims arising under the policy, seeking recovery of losses covered by the policy, lost profits, other consequential damages, and treble damages under article 21.21 of the Texas Insurance Code, Tex.Ins.Code Ann. art. 21.-21 (Vernon 1981), and seeking the return of layup premiums.[1]

The district court, 610 F.Supp. 229, sitting in admiralty without a jury, entered judgment against Lexington in the amount of $367,592 for amounts owed under the policy,[2] plus prejudgment and post-judgment interest, and $2,582,547 in punitive damages[3] under article 21.21, plus costs, post-judgment interest, and stipulated attorney's fees. This appeal followed.

## II. LEXINGTON'S CONTENTIONS

Lexington levels numerous attacks on the judgment entered by the district court. Lexington first offers two arguments for reversing the entire judgment: (1) the alleged misrepresentations made by the insured voided the policy, and (2) the alleged unseaworthiness of the vessel voided the policy. Lexington next offers several arguments for reducing the amount of the damages awarded against it because the district court erred: (1) in determining the cost to repair the vessel, (2) in subtracting only one deductible amount from the cost to repair, (3) in awarding layup premiums, (4) in determining that crew negligence caused all the losses, (5) in determining

that Lexington's actions caused Austin to lose a future charter party agreement, (6) in determining other consequential damages incurred by Austin, and (7) in applying the punitive provisions of article 21.21 of the Texas Insurance Code.

## III. LEXINGTON'S LIABILITY

### A. *Misrepresentation*

■ Lexington's first argument for reversal is that the district court erred in finding that the alleged misrepresentations made by the insured did not void the policy.

Nothing is better established in the law of *marine* insurance than that "a mistake or commission material to a marine risk, whether it be wilful or accidental, or result from mistake, negligence or voluntary ignorance, avoids the policy. And the same rule obtains, even though the insured did not suppose the fact to be material."

*Fireman's Fund Insurance Co. v. Wilburn Boat Co.*, 300 F.2d 631, 646 (5th Cir.), *cert. denied,* 370 U.S. 925, 82 S.Ct. 1562, 8 L.Ed.2d 505 (1962) (emphasis in original) (citation omitted); *see also Gulfstream Cargo, Ltd. v. Reliance Insurance Co.*, 409 F.2d 974, 980 (5th Cir.1969). "A material fact is any fact, 'the knowledge or ignorance of which would naturally influence an insurer in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of insurance.'" 300 F.2d at 640 (citations omitted).

Lexington claims that Hall & Co., Austin's broker, misrepresented Austin's maritime experience by stating that Austin had owned and operated the AMAZON TRADER for twelve years, that Austin owned numerous other maritime interests includ-

---

**1.** Austin also sued Servac and Gaafar, alleging breaches of the charter party and seeking actual and consequential damages. The district court entered a take-nothing judgment in favor of Servac and Gaafar. Austin has not appealed the district court's ruling.

**2.** The amount owed under the policy consisted of the $373,600 cost to repair the vessel, less a

$12,500 deductible, plus the return of $6,492 in layup premiums, for a total of $367,592.

**3.** The punitive damages consisted of the $373,-600 cost to repair the vessel, less the $12,500 deductible, plus $390,000 for lost future profits, plus $109,749 of other expenses, for a total of $860,849. The district court then trebled this amount to arrive at a figure of $2,582,547.

ing twenty fishing vessels, and that Austin was contemplating the purchase of two new vessels, when in fact Austin had just purchased the AMAZON TRADER, had previously owned only one other vessel, an oilfield supply boat, and was not contemplating the purchase of additional vessels. Lexington further claims that the alleged misrepresentations were material to its determination of the risk.

Lexington cites the testimony of one witness, Niels Aaskov, an employee of Lexington's underwriting agent, Southeastern Risk Specialists, to support its contentions. Aaskov testified, based on a worksheet prepared at the time, that an employee of Hall & Co., Frank Sioli, informed him that the owner of the AMAZON TRADER had owned and operated the vessel for twelve years, that the owner owned numerous other vessels, and that the owner was contemplating the purchase of two other vessels. Later, on cross-examination, Aaskov testified that, in addition to gathering information on the current owner, he also compiled information concerning the previous owner. The previous owner of the vessel, Hines Worbs, had operated the vessel for twelve years, owned numerous other vessels, and was contemplating the purchase of two new vessels.

The district court also had before it the testimony of several other witnesses concerning the alleged misrepresentations. Sioli, the agent who contacted Aaskov concerning coverage for the AMAZON TRADER, testified that he met with Austin before contacting Aaskov and that he knew Austin owned the vessel. He further testified that he knew that the previous owner had not retained any ownership interest or managerial involvement with the vessel and that nothing in Hall & Co.'s files reflected that Sioli ever told Aaskov otherwise. Austin also testified that he told Sioli and the president of Hall & Co. that

he owned the vessel. Furthermore, Lexington issued the policy to: "Aulemic, Inc. and Mr. James D. Austin, c/o Mr. James D. Austin."

We do not believe the district court's finding that no material misrepresentation occurred is clearly erroneous, *see* Fed.R. Civ.P. 52, as it is "plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer City*, 470 U.S. 564, ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985). Based on the testimony before it, the district court easily could have decided that Sioli provided Aaskov with the correct information and that Aaskov somehow confused the past owner's experience with the present owner's experience. Since the district court's finding is plausible, we cannot disturb it.[4]

### B. *Seaworthiness*

Lexington next contends that the policy was void from its inception because Austin allowed the vessel to sail in an unseaworthy condition.

A warranty of seaworthiness by the owner is implied in every hull insurance policy unless expressly waived. The warranty is a continuing obligation that "the owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthiness condition.... The consequence of a violation of this 'negative' burden is merely a denial of liability for loss or damage caused proximately by such unseaworthiness."

*Insurance Co. of North America v. Board of Commissioners*, 733 F.2d 1161, 1165 (5th Cir.1984) (citations omitted); *see also D.J. McDuffie, Inc. v. Old Reliable Fire Insurance Co.*, 608 F.2d 145, 147 (5th Cir. 1979), *cert. denied*, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980); *Saskatchewan Government Insurance Office v. Spot*

---

**4.** Lexington further contends that the AMAZON TRADER was laid-up without a crew and was not operated under her own power from December 1980 to January 1982 and that Hall & Co. should have disclosed this fact to Lexington. Contrary to Lexington's contention, the evi-

dence reveals that the vessel operated until March 12, 1981, when it was arrested for nonpayment of debt. The deck logs further reveal that the crew remained on board into April 1981. Thus, Lexington bases its contention on an incorrect premise.

*Pack, Inc.*, 242 F.2d 385, 388 (5th Cir.1957). The law presumes that every vessel is seaworthy until the contrary is proved, and the burden of proving unseaworthiness lies with the insurance company. *Hanover Fire Insurance Co. v. Holcombe*, 223 F.2d 844, 845–46 (5th Cir.), *cert. denied*, 350 U.S. 895, 76 S.Ct. 154, 100 L.Ed. 787 (1955).

 Lexington contends that the AMAZON TRADER was unseaworthy in two respects: (1) various mechanical deficiencies rendered the vessel unseaworthy and (2) the incompetence of the crew rendered the vessel unseaworthy. Lexington relies on the testimony of two expert witnesses to the effect that the vessel was unseaworthy due both to mechanical deficiencies and crew incompetence; however, the record also contains testimony to the opposite effect. At least five witnesses attested to the seaworthiness of the vessel, and one expert witness testified that the entire crew was competent. Since ample testimony supported the district court's finding that the vessel was not unseaworthy, the district court's finding is clearly plausible in light of the evidence, and we therefore refuse to set aside its finding. *See* Fed.R. Civ.P. 52; *Anderson v. City of Bessemer City*, 470 U.S. at ——, 105 S.Ct. at 1512, 84 L.Ed.2d at 528; *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746, 766 (1948).

## IV. AMOUNT OF DAMAGES

### A. *Repair Costs*

Lexington contends that the district court erred in determining the cost to repair the vessel. The district court selected the figure suggested by Austin's expert, $373,600, and awarded Austin that amount less the $12,500 deductible. Lexington urges us to reject the figure accepted by the district court and to accept the figure suggested by Lexington's expert, $45,851. Lexington would have us overturn the district court's finding because Lexington's expert allegedly prepared a more "detailed" and "careful" report than did Austin's expert and because Austin's expert's report is "ephemeral in the extreme and inherently suspect." The district court observed both experts at trial and heard each expert's explanation of how he arrived at the figures used in the reports. The credibility judgments Lexington asks us to make are exactly the judgments that the Federal Rules of Civil Procedure leave for the district court to make. Fed.R.Civ.P. 52(a) ("due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses"); *Anderson v. City of Bessemer City*, 470 U.S. at ——, 105 S.Ct. 1504, 84 L.Ed.2d at 518 ("[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings"). We therefore refuse to disturb the district court's factual finding as to the cost to repair the vessel.

### B. *Deductible Amount*

In addition to arguing that the district court erred in computing the cost to repair the vessel, Lexington also argues that the district court erred in applying only one deductible amount to the costs of repairs. The policy provides: "[T]here shall be deducted from the aggregate of all claims ... arising out of each separate accident, the sum of $12,500...." Austin maintains that the district court correctly applied only one deductible because only one accident occurred, i.e., the captain's negligence in operating the vessel. Two decisions of the captain caused the damage to vessel: first, when the clutch began slipping, the captain ordered the clutch welded in the engaged position, resulting in damage to the engine and the power train, second, after discovering that the fuel used in the generators was contaminated, the captain allowed the crew to continue using the contaminated fuel in the generators, resulting in damage to the generators.

 Lexington urged the district court and now urges this court to apply a separate deductible to each item of equipment damaged by the captain's negligence. For example, Lexington would apply a separate deductible to each of the generators damaged by the contaminated fuel, although

the captain's one act of negligence in ordering the use of contaminated fuel damaged all the generators, and would apply separate deductibles to the engine, the clutch, and the tailshaft, although the captain's one act of negligence in ordering the clutch welded caused the damage to all three of these items.

■ While we cannot agree with Lexington's contention that up to ten deductibles should apply to Austin's claim, we do agree that the district court erred in applying only one deductible. The court should have applied the deductible twice since two separate accidents occurred. The first occurred when the captain decided to order the clutch welded, and the second occurred when the captain decided to allow the crew to continue using contaminated fuel in the generators. We therefore modify the recoverable cost of repairs by reducing it an additional $12,500 to $348,600.

### C. Layup Premiums

■ Lexington next attacks the district court's award of layup premiums to Austin. The policy provides that the insurance company would return the premiums applicable to each period of thirty consecutive days the vessel was laid up. The AMAZON TRADER was laid up for four consecutive thirty-day periods in Spain when it broke down on its way back to Tampa; however, when Austin requested return of the applicable premiums, Lexington refused to return them. Lexington argues that Austin violated the following provision of the policy: "[I]n no case shall a return for lay-up be allowed when the Vessel is lying ... in any location not approved by the Underwriters." Lexington argues that since Lexington did not approve the layup in Spain, Austin is not entitled to lay up premiums. We disagree.

The policy does not say that Lexington must first approve a layup port; rather, the policy says that layup premiums will not be allowed when the vessel is laid up in a location "not approved by the Underwriters." This ambiguous phrase could easily be construed as meaning that Lexington

maintained a list of unapproved ports and that the vessel could not be laid up at one of those ports. Applying the time-honored rule that ambiguities in insurance policies are to be construed against the insurer, *Walter v. Marine Office of America*, 537 F.2d 89, 94–95 (5th Cir.1976), we hold that the district court correctly determined that Austin was entitled to layup premiums.

### D. Crew Negligence

Returning to its wholesale attack on the factual findings made by the district court, Lexington next contends that the district court erred in finding that crew negligence caused the damage to the AMAZON TRADER. This finding was critical to the district court's award of damages for the cost of repairs because the court relied only on the Inchmaree clause of the insurance policy in awarding damages. The Inchmaree clause covers damage to the vessel caused by the negligence of the master, officers, crew, or pilots. Thus, if the damage to the vessel was not the result of crew negligence, the Inchmaree clause does not provide coverage.

■ Lexington again urges us to accept the version of the facts as related by its expert rather than the version related by Austin's expert and accepted by the district court. Again we must decline. Austin's expert testified that the captain of the vessel was negligent in ordering the clutch welded into a solid unit and in continuing to operate the generators with contaminated fuel. Thus, the district court's finding that crew negligence caused the damage to the vessel is entirely plausible and must be upheld on appeal.

### E. Future Charter

■ Lexington next argues that the district court erred in finding that Lexington's actions caused Austin to suffer $390,000 in damages for the loss of a future charter party. The district court found that, under the proposed thirty-month charter party, Austin would have earned a profit of $13,-000 a month, resulting in a $390,000 loss

when Servac retracted the offer. Lexington argues that its actions did not cause Servac to retract the offer. We agree.

On July 8, 1982, while the AMAZON TRADER was enroute from Tampa to Alexandria, Servac made an offer for a thirty-month charter of the vessel. No evidence in the record indicates that Austin accepted Servac's offer. In early August, before Servac had any knowledge of Lexington's handling of the claim, Servac decided to have nothing more to do with the AMAZON TRADER. Our review of the evidence indicates that, while there are several plausible reasons for Austin's and Servac's failure to agree to a long-term charter party, i.e., mechanical problems with the vessel, delays in the vessel's return voyage, and disputes over whether Servac or Austin was responsible for repairs, none of the explanations have anything to do with Lexington. Thus, finding ourselves left with a definite and firm conviction that a mistake has been made and finding the district court's finding implausible in light of the evidence, we reverse as to this element of damages.

### F. *Other Consequential Damages*

Lexington's next contention is that the district court erred in awarding Austin $109,749 in other consequential damages.

**5.** While Austin did not introduce evidence to connect Lexington to the expenses Austin incurred while the vessel was laid up, some of Austin's testimony is relevant to the inquiry. Austin testified that, had Lexington promptly agreed to pay for the needed repairs, he would have incurred approximately $125,000 in expenses for maintaining the crew and vessel while repairs were being made and for bringing the vessel back across the Atlantic. Thus, Austin, according to his own testimony, incurred less expense by Lexington's delay than would have been incurred had Lexington promptly paid for the repairs.

**6.** At the time of trial and at the time the alleged unfair settlement practices occurred, the pertinent part of article 21.21 read as follows:

Sec. 16(a) Any person who has been injured by another's engaging in any of the practices declared in Section 4 of this Article or in rules or regulations lawfully adopted by the Board under this Article to be unfair methods of

The damages consisted of Austin's expenses for crew wages, port fees, inspections, and other costs incurred while Austin sought repair approval for the vessel.

While ample testimony and documentation support the district court's finding that Austin incurred these expenses, the evidence fails to connect the expenses with Lexington's actions. No testimony indicated that Austin would not have incurred these expenses had Lexington promptly determined coverage and paid for the repairs. When substantial evidence does not support a finding of the district court, we may set that finding aside as clearly erroneous. *United States v. Florida,* 482 F.2d 205, 208 (5th Cir.1973); *Ward v. Hobart Manufacturing Co.,* 450 F.2d 1176, 1182–83 (5th Cir.1971). Since no evidence was introduced to show that Lexington's conduct caused Austin to incur the expenses, the district court's finding is clearly erroneous, and we reverse this element of the damage award.[5]

### G. *Treble Damages*

Lexington's final argument is that the district court erred in concluding that it could apply the treble damages provision of article 21.21 of the Texas Insurance Code, Tex.Ins.Code Ann. art. 21.21 § 16 (Vernon 1981).[6] The district court held that the

competition and unfair and deceptive acts or practices in the business of insurance or in any practice defined by Section 17.46 of the Business & Commerce Code, as amended, as an unlawful deceptive trade practice may maintain an action against the company or companies engaging in such acts or practices.

(b) In a suit filed under this section, any plaintiff who prevails may obtain:

(1) three times the amount of actual damages plus court costs and attorney's fees reasonable in relation to the amount of work expended;

(2) an order enjoining such acts or failure to act;

(3) any other relief which the court deems proper.

(Vernon 1981). Between the time of trial and the time the district court entered judgment, the Texas Legislature altered article 21.21 to read as follows:

Sec. 16.(a) Any person who has sustained actual damages as a result of another's engag-

insurance policy was issued to and was payable to Texas plaintiffs and was therefore subject to the provisions of the Texas Insurance Code. *See* Tex.Ins. Code Ann. art. 21.42 (Vernon 1981). Lexington argues, first, that the court should have applied a federal rule to answer the question of whether treble damages are available and, second, that, if state law does apply, the court should have applied Florida rather than Texas law. Austin maintains that Texas law applies.

We begin our choice of law analysis with *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). *Wilburn Boat* teaches that, in the absence of a controlling federal admiralty rule, we are to turn to state law. *Id.* at 314–16, 75 S.Ct. at 370–71, 99 L.Ed. at 342–44. *Wilburn Boat*, however, does not address the question of which state's law to apply.

■ Applying *Wilburn Boat*, we turn to the question of whether a controlling federal admiralty rule answers the question raised by the district court's award of treble damages. The question raised is whether, when an insurance company "engages[s] in unfair and deceptive acts or practices" in the handling of its claims, may a district court award the insured three times his damages. Our review of admiralty law has not revealed, nor have the parties cited, any federal rule controlling the damages recoverable by an insured allegedly injured by the insurer's unfair acts in the handling of a claim.[7] In the absence of a controlling federal rule, we must turn to state law for the answer to the question of whether an insured may recover treble damages for unfair claims handling practices.

■ Lexington strongly urges the application of Florida law to the case, while Austin maintains that Texas law applies. We find it unnecessary to determine whether Texas or Florida law applies, since the result is the same under each state's law. Neither Texas nor Florida permits the recovery of treble damages under the facts of the instant case.

At the time the district court concluded that article 21.21 permitted Austin to recover treble damages, no Texas court had decided whether article 21.21 applied to a property insurer who failed to fairly handle a claim made by his insured. However, since the district court entered judgment, two Texas Courts of Appeal have addressed situations identical to those in the present case. In both cases the plaintiff-insured alleged that the defendant-insurer engaged in unfair claims settlement practices, and in both cases the Texas courts held that article 21.21 did not provide the insured a cause of action for unfair claims settlement practices.

In *Texas Farm Bureau Mutual Insurance Co. v. Vail*, 695 S.W.2d 692 (Tex.App. —Dallas 1985, no writ), following the insurance company's denial of the insureds' fire loss claim, the insureds recovered treble damages based on their allegations of unfair claims settlement practices. The court

---

ing in an act or practice declared in Section 4 of this Article or in rules or regulations lawfully adopted by the Board under this Article to be unfair methods of competition or unfair or deceptive acts or practices in the business of insurance or in any practice defined by Section 17.46 of the Business & Commerce Code, as amended, as an unlawful deceptive trade practice may maintain an action against the person or persons engaging in such acts or practices.

(b) In a suit filed under this section, any plaintiff who prevails may obtain:

(1) the amount of actual damages plus court costs and reasonable and necessary attorneys' fees. If the trier of fact finds that the defendant knowingly committed the acts complained of, the court shall award, in addition, two times the amount of actual damages; or

(2) an order enjoining such acts or failure to act; or

(3) any other relief which the court deems proper.

(Vernon Supp.1986).

7. While Lexington now claims that such a rule exists, Lexington is unable to cite a single case containing a federal rule on the subject. Interestingly, Lexington's Proposed Conclusions of Law filed in the district court contain the following statement: "Any question of unfair or inequitable claims handling is a matter of state law, there being no clearly established rule of federal jurisprudence on the subject."

of appeals, in holding that article 21.21 did not permit the insured to recover damages, stated that " 'it was the intent of the legislature to "seal off" unfair claims settlements from the expansive language of the DTPA and the Insurance Code.' " *Id.* at 694 (citation omitted). In *Chitsey v. National Lloyd's Insurance Co.*, 698 S.W.2d 766 (Tex.App.—Austin 1985, writ of error granted), the jury found, in answer to a special issue, that the insurer engaged in an unfair act or practice in its handling of the insured's claim. The court of appeals held that the jury's finding did not entitle the insured to recover treble damages because article 21.21 did not apply to unfair claims settlement practices.[8]

Two federal district courts sitting in Texas have also held that article 21.21 does not provide the insured a cause of action for unfair claims settlement practices against property insurers. *Lexington Insurance Co. v. Bennet Evans Grain Co.*, No. C.A. G-84-184 (S.D.Tex. Feb. 17, 1986); *South Teaxs National Bank of Laredo v. United States Fire Insurance Co.*, 640 F.Supp. 278 (S.D.Tex.1985). Thus, if Texas law applies to the instant case, the district court erred in awarding treble damages to Austin.

Similarly, Florida law does not provide the insured with a cause of action for treble damages if the insurance company engages in unfair claims settlement practices. By statute, Florida law prohibits unfair practices, Fla.Stat.Ann. § 626.9521 (West 1984), and specifically provides that unfair claims practices are one type of unfair practice, Fla.Stat.Ann. § 626.9541(1)(i) (West 1984). The section prohibiting unfair practices, section 626.9521, provides that the violator shall be subject to penalties provided in section 627.381, which in turn provides for administrative fines and license suspensions, but does not provide for recovery of treble damages. Fla.Stat. Ann. § 627.381 (West 1984). Thus, if Florida rather than Texas law applies to the instant case, the district court would still be in error in awarding Austin treble damages. Since neither Texas nor Florida law permits the recovery of treble damages from an insurer who engages in unfair claims settlement practices, we reverse the portion of the district court's judgment awarding Austin treble damages.[9]

## V. CONCLUSION

We affirm the portion of the district court's judgment awarding Austin $361,100 as his costs of repairs; however, we modify that amount by subtracting an additional deductible of $12,500, leaving a recoverable cost of repairs of $348,600. We also affirm the portion of the judgment awarding Austin layup premiums in the amount of $6,492. We reverse all the remaining portions of the judgment awarding damages against Lexington. We remand the case to the district court with instructions to enter judgment for Austin in the amount of $355,092, plus attorney's fees, costs, and pre- and post-judgment interest.[10]

---

**8.** Austin argues that the decisions of the Texas Court of Appeals, rather than reaching consistent decisions on the applicability of section 21.-21 to unfair claims settlement cases, are split. Austin cites two cases for this proposition. *Allstate Insurance Co. v. Kelly*, 680 S.W.2d 595 (Tex.App.—Tyler 1984, writ ref'd n.r.e.); *St. Paul Insurance Co. v. McPeak*, 641 S.W.2d 284 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.). As the court in *Vail* noted, the duties and responsibilities of a property insurer differ from those of other types of insurance providers. *Vail*, 695 S.W.2d at 694. In *Kelly* the insured brought suit for the insurer's handling of a suit brought by a third party against the insured. In *McPeak* the insured brought suit after the insurer terminated his worker's compensation benefits. Since *Kelly* and *McPeak* are distinguishable from *Vail* and *Chitsey*, both property cases, the Texas cases addressing unfair claims settlements in a property damage context are consistent.

**9.** Lexington also argues that the district court's factual findings regarding Lexington's resolution of Austin's claim are clearly erroneous. In light of our holding that Austin is not entitled to excess damages for unfair claims settlement practices, if any, we need not reach this contention.

**10.** The district court awarded Austin attorney's fees in amounts stipulated to by the parties. Lexington has not appealed this portion of the district court's judgment; therefore, the district

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

court should include the stipulated amount of attorney's fees for the trial and appeal in the new judgment.