747 F.2d 689
 1985 A.M.C. 956, 53 USLW 2299
 STEELMET, INC., Plaintiffs-Appellants, Cross-Appellees,
Jarrell R. Jackson, Intervening Plaintiff-Appellee,
v.
CARIBE TOWING CORP., Marine Exploration Co., Inc.,
Defendants-Appellants,
Alabama-Puerto Rico Barge Line, Inc., Defendant,
and
Frank J. Hall & Company, Third-Party-Defendant-Appellee,
American Marine Underwriters, Calvert Fire Insurance Co.,
Third-Party-Defendants-Appellees, Cross-Appellants.
 No. 82-6142.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 29, 1984.
 
 John B. Culp, Jr., G.J. Rod Sullivan, Jr., Jacksonville, Fla., for steelmet.
 Edward F. Gerace, Tampa, Fla., for Caribe and Marine Exploration.
 Richard R. McCormack, Miami, Fla., for American & Calvert.
 John D. Kallen, Hayden & Milliken, Wm. E. Cassidy, Miami, Fla., for Jarrell R. Jackson.
 Appeals from the United States District Court for the Southern District of Florida.
 Before GODBOLD, Chief Judge, JOHNSON and CLARK, Circuit Judges.
 GODBOLD, Chief Judge:
 
 
 1
 In this case insurance coverage on cargo was extended to a carrier while the carrier knew its barge was unseaworthy, and the facts of that condition were not communicated to insurers. Barge and cargo were lost, and the shipper attempts to recover on the carrier's protective and indemnity policy. Because the district court erred in giving collateral estoppel effect to findings of an earlier arbitration, we reverse and remand for a new trial.
 
 I. Background[1]
 
 2
 Steelmet is one of a group of shippers of steel bars who are plaintiffs in this action. Caribe Towing Corporation was a carrier and former owner of the tug CARIBE and barge ATC 21. Steelmet and Caribe entered into a charter party for the delivery of steel bars from Tampa, Florida to San Juan, Puerto Rico. Before the voyage began on November 26, 1976 Caribe Towing was acquired by Marine Exploration Company (MEC), which thereby became the beneficial owner of the CARIBE and barge ATC 21, and the charter party was assigned by Caribe to MEC.
 
 
 3
 Prior to November 21 the tug and barge arrived in Tampa from a previous voyage to Puerto Rico. Seawater was found in the hold of the barge as a result of damage during the voyage. A repair company was engaged to correct this damage. On November 21 a condition survey was made of the barge. The barge passed for loading, but the surveyor severely criticized the barge's condition. On November 22, while cargo was being loaded, the crew heard a loud, hollow, booming noise come from the barge and saw several large air bubbles three to four feet in diameter appear at the stern. Everyone left the barge, but loading recommenced when no problem was discovered. The master requested a diver's inspection, but the owner twice denied the request. The log book reflects the captain's belief that the barge had either broken her back or run aground. After loading was completed, the cargo hatches could not be closed because they had changed in size, an indication of structural damage. They were forced on with hydraulic jacks.
 
 
 4
 Even after the loading seawater was still present in the hold. Owners attempted a test to determine if a problem was evidenced by the boom and bubble incident but gave up when the test would not work.
 
 
 5
 Prior to the tug and barge setting sail, MEC requested coverage of barge and tug under its hull and protective and indemnity policies previously issued to MEC by insurers American Marine Underwriters (AMU) and Calvert Fire Insurance Company. Insurers requested condition surveys of the barge and tug. None of the surveys supplied showed the problems indicated by the events we have described. MEC did not communicate those events to the insurers. The barge and tug were added to MEC's fleet policy on November 24. The protective and indemnity policy (P & I) covered certain risks, including cargo losses.
 
 
 6
 The tug and barge left Tampa on November 26. On December 6, while the tug was en route, MEC telephoned the insurers to have Caribe Towing added as an additional insured, and Jarrel Jackson as an additional loss payee on the tug, and Alabama-Puerto Rico Barge Line as an additional loss payee on the barge. Unknown to the insurers, but known to MEC, the barge was then about to sink. Seas were washing over the top of the barge, and a man stood a continuous ax watch to cut the tow rope if the barge appeared to be going down for the last time. The barge later sank with the steel cargo before reaching Puerto Rico.
 
 
 7
 Steelmet sued Caribe Towing and MEC alleging that their acts caused the sinking of the barge and the loss of its cargo. This dispute was forced to arbitration pursuant to the arbitration clause in the charter party. The arbitrators rendered their decision in favor of Steelmet, holding that the barge was unseaworthy when it left Tampa, that the unseaworthiness caused the sinking and loss of the cargo, and that MEC knew of facts upon which reasonable inspection would have revealed the unseaworthiness of the barge.
 
 
 8
 Steelmet moved in district court to enforce the arbitration award. Jarrel Jackson filed an intervening complaint contending that his $50,000 ship's mortgage on the tug took preference over Steelmet's claim (the tug had been arrested in rem and sold, with funds paid to the court). MEC filed a third party complaint against AMU and Calvert seeking to enforce its rights under the P & I policy and the hull policy. AMU and Calvert denied liability to MEC, alleging that MEC did not have an insurable interest in the tug or the barge, that MEC willfully misrepresented its interest in both, and most important, that MEC knew the barge was unseaworthy and notwithstanding this knowledge willfully misrepresented or concealed the condition, which was material to the placement and issuance of the coverage.
 
 
 9
 Steelmet attempted to file a direct action against the insurers, but the trial court never ruled on its motion to do so. Instead the trial court allowed Steelmet to participate in the trial of MEC's claim against the insurers as if it had a direct action.
 
 
 10
 After a nonjury trial the district court granted Steelmet judgment on the arbitration award against MEC. The district court held that under established rules of marine insurance MEC's failure to inform the insurers of adverse changes in the condition of the barge, as previously determined by the arbitrators, voided coverage under the insurance policies. The court dismissed MEC's and Steelmet's claim against the insurers and awarded Jackson the amount of his lien.
 
 
 11
 The district court held that collateral estoppel precluded MEC and Steelmet from relitigating the issues decided in the arbitration, which established sufficient knowledge and concealment to void the policies.
 
 
 12
 Steelmet and MEC appeal. Insurers also attack the court's findings that MEC beneficially owned and had an insurable interest in the tug and barge on November 24 when the binder was issued and that MEC had been assigned the charter on the barge.
 
 
 13
 II. Collateral estoppel effect of the findings of arbitrators
 
 
 14
 The insurers argue that the district court correctly made offensive use of the findings of the arbitrators against Steelmet and MEC in order to establish that MEC knew of problems with the barge that indicated its unseaworthiness but failed to inform the insurers of those problems. The policy, according to insurers, was properly voided. MEC and Steelmet contend that the arbitrators' findings are not binding because the issues and burden of proof in this proceeding and the arbitration are not the same.
 
 
 15
 Offensive use of collateral estoppel is no longer prohibited. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552, 562 (1979). When there is a significant likelihood of unfairness, however, application of the doctrine constitutes an abuse of discretion. See Deweese v. Town of Palm Beach, 688 F.2d 731, 734 (11th Cir.1982).
 
 
 16
 Three general requirements for application of the doctrine exist:
 
 
 17
 (1) that the issue at stake be identical to the one involved in the prior litigation;
 
 
 18
 (2) that the issue have been actually litigated in the prior litigation; and
 
 
 19
 (3) that the determination of the issue in the prior litigation have been a critical and necessary part of the judgment in that earlier action.
 
 
 20
 Id. at 733.
 
 
 21
 In the arbitration proceeding the issues were governed by the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. Secs. 1300-1315 (1976). Under that act the shipper (Steelmet) establishes a prima facie case by showing that it delivered cargo to the carrier (MEC) in good condition and that the cargo was unloaded in a damaged condition or, as in this case, never delivered because of sinking. See Terman Foods, Inc. v. Omega Lines, 707 F.2d 1225, 1227 (11th Cir.1983); Blasser Bros. v. Northern Pan-American Line, 628 F.2d 376, 381, 382 (5th Cir.1980). Then the burden shifts to the carrier to prove that it exercised due diligence in handling the cargo and making the ship seaworthy. 628 F.2d at 381. In the arbitration proceeding MEC argued that it exercised due diligence in investigating and acting upon the sea water leaks, the boom and bubble incident, and the ill-fitting hatches and in putting to sea in spite of these conditions. The arbitrators found that the barge was unseaworthy and that with knowledge of the surrounding facts MEC did not exercise due diligence to make it seaworthy or sufficiently test its unseaworthiness. The arbitrators further found that the unseaworthiness caused the sinking of the barge.
 
 
 22
 Steelmet and MEC contend that the issues are not the same in the arbitration and in the third party action against the insurer to recover on the policy, and that the lack of identity of issues precludes offensive use of collateral estoppel. They argue that, as between them and the insurers, it must be shown that MEC knew of the unseaworthiness or of facts sufficient to put it on notice of unseaworthiness, that it concealed this from the insurer and that such facts were material to the issuance of the P & I policy.
 
 
 23
 The first prong of the insurance issues (knowledge of facts) was clearly determined in the first proceeding. As to the second prong, MEC and Steelmet appear to agree that the insurers were never told about the problems with the condition of the barge. They argue that the failure to tell does not rise to the level of fraudulent concealment. Finally they argue that materiality was never determined in the arbitration proceeding.
 
 
 24
 Assuming without deciding that the issues were similar, the difference in the allocation of the burdens of proof in the two proceedings prevents offensive use of the arbitrators' findings in MEC's third party complaint against the insurers on the policy.
 
 
 25
 As discussed above, in the COGSA arbitration MEC bore the burden of proof on its exercise of due diligence, i.e., that it did not know of sufficient facts to put it on notice that the vessel was unseaworthy and that it performed tests sufficient to discharge its duty of reasonable care. See Terman Foods, 707 F.2d at 1277; Blasser Bros. In the third party action between MEC (and Steelmet) and the insurers, once MEC showed that the loss fell within the terms of the policy, the insurer had the burden of proving that the policy was void for concealment or some other exclusion. See Ideal Mutual Insurance Company v. C.D.I. Construction Inc., 640 F.2d 654, 656 n. 2 (5th Cir.1981) (Unit B) (applying Florida law, which governs in admiralty cases on insurance questions absent a clearly established federal rule to the contrary, see D.J. McDuffie, Inc. v. Old Reliable Fire Insurance Co., 608 F.2d 145, 147 n. 1 (5th Cir.1979), cert. denied, 949 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980)). Thus in the prior action, where MEC bore the burden, MEC was unable to prove that it lacked knowledge of unseaworthiness or of facts sufficient to put it on notice of unseaworthiness and was unable to prove that it exercised due care to make the vessel seaworthy. By invoking collateral estoppel in the present action the district court allowed the insurers to take advantage of MEC's failure to carry the burden in the prior proceeding on issues on which the insurer had the burden in the third party action.
 
 
 26
 Little case law exists on application of collateral estoppel when the burden is allocated differently in the two proceedings, but the academic commentary suggests that collateral estoppel should be denied in situations where the burden is allocated differently. As Wright and Miller say:
 
 
 27
 Shifts in allocation of the burden of persuasion generally should follow the same principle as changes in the decree [sic] of persuasion. Failure of one party to carry the burden of persuasion on an issue should not establish the issue in favor of an adversary who otherwise would have the burden of persuasion on that issue in later litigation. For example, failure of a plaintiff to carry the burden imposed in some states to show the plaintiff's own freedom from contributory negligence should not establish the plaintiff's negligence in a subsequent action by the former defendant. This result should not be defeated by the formal argument that if the preponderance does not lie on one side, it must lie on the other. As a purely formal matter, it is possible that the initial determination rested on a conclusion that the evidence was in exact equipoise. More important, actual application of the preponderance standard does not depend on any process so unrealistic as to assume that a line of exact equipoise can be drawn. A conclusion that the burden has not been carried is only a conclusion that there remains sufficient uncertainty to require that the issue not be made a basis for decision. The actual nature of the uncertainty that requires inaction quite properly depends on the nature of the matters involved--it is often a broad zone rather than a narrow line. An extreme testing illustration can be found in a case in which no evidence of the issue is available to either party. Failure of one party to carry the burden of persuasion cannot stand as an adjudication that the other party would have carried the burden.
 
 
 28
 The rule that a shift in the burden of persuasion defeats preclusion should apply even if the first action went beyond a negative finding that the burden was not carried. In the example offered above, the first court might go beyond a ruling that the plaintiff had failed to show freedom from contributory negligence to a ruling that in fact the plaintiff was guilty of contributory negligence. On its face, this ruling might seem to warrant preclusion by indicating a determination that the defendant would have been found to carry the burden of proving the negligence of the plaintiff. Any such determination, however, would not be necessary to decision of the first action and may be denied preclusive effect on that score. Denial of preclusion, moreover, rests on grounds deeper than the general necessity principle. However difficult it may be to justify in terms of abstract burden theory, the fact remains that direct responsibility for immediate consequences is apt to control resolution of uncertainty. A tribunal that is prepared to state that the plaintiff was negligent when nothing turns on the statement might easily make a different statement if the defendant's claim were before it for actual disposition. Even if the same formal conclusion were reached as to negligence, moreover, actual measurement of damages is often affected by the degree of remaining uncertainty as to liability. To establish liability by the statement of a tribunal that had no damages issue before it, and to measure damages in isolation, may make far too much of the initial statement.
 
 
 29
 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, Secs. 4422, at 212-14 (1981) (footnotes omitted).
 
 
 30
 The Restatement (Second) of Judgments also supports this view:
 
 
 31
 Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:
 
 
 32
 (4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action....
 
 
 33
 Restatement (Second) of Judgments Secs. 28 (1980) (emphasis added).
 
 
 34
 The few cases that have considered this question have indicated that the change in allocation of the burden of proof makes a difference. See Worcester v. Commissioner, 370 F.2d 713, 716-17 (1st Cir.1966) (where government bore burden in previous action and Worcester bore it in later action, government was not collaterally estopped to relitigate issues decided in previous action); City of Port Arthur v. U.S., 517 F.Supp. 987, 1004-05 n. 119 (D.D.C.1981) (three-judge court) (collateral estoppel denied where burden of proof allocated differently in two proceedings), aff'd, 459 U.S. 159, 103 S.Ct. 530, 74 L.Ed.2d 334 (1982). Finally, our cases have recognized that where the level of proof is lower in the second proceeding the failure of an adversary to carry a higher burden in the earlier proceeding does not allow use of the failure in the earlier proceeding to collaterally estop the adversary in the later proceeding. See Strachan Shipping Co. v. Shea, 406 F.2d 521, 522 (5th Cir.), cert. denied, 395 U.S. 921, 89 S.Ct. 1773, 23 L.Ed.2d 238 (1969).
 
 
 35
 We conclude that MEC's failure to carry its burden on the relevant issues before the arbitrators should not estop it from forcing the insurers to carry their burden of proving issues relevant to lack of coverage. Since the district court did not take any evidence on issues decided by the arbitrators because he felt bound by the arbitrators' decision, we remand the case for trial on Steelmet's direct action and MEC's third party complaint against the insurers and consideration of those issues anew.
 
 III. Concealment as a defense to coverage
 
 36
 The parties dispute whether concealment can void a P & I policy, and if so, to what level the concealment must reach.
 
 
 37
 MEC seeks to recover on its P & I policy from AMU and Calvert. The policy covers MEC for such sums as it shall have become legally liable to pay and shall have paid as a result of certain events, and cargo losses is one of those events. Under COGSA, MEC was found liable for the value of the cargo because it could not prove that it exercised due care to make the vessel seaworthy and that it did not know of sufficient facts to put it on a duty of further investigation.
 
 
 38
 We are asked to resolve a conflict between the general rule of marine insurance that requires full disclosure (even if innocently omitted) of all material facts to the insurer to avoid voiding a policy and several cases from the 1920's indicating that this general rule applies only to hull policies and does not apply to P & I policies except where the failure to disclose amounts to fraud or gross negligence.
 
 
 39
 The general rule of marine insurance, requiring full disclosure, is well settled in this circuit, and as a clear rule of maritime law it is the controlling federal rule even in the face of contrary state authority. See D.J. McDuffie, 608 F.2d at 147 n. 1. As stated in Gulfstream Cargo, Ltd. v. Reliance Insurance Co., 409 F.2d 974, 980 (5th Cir.1969) (quoting Fireman's Fund Insurance Co. v. Wilburn Boat Co., 300 F.2d 631, 646 (5th Cir.), cert. denied, 370 U.S. 925, 82 S.Ct. 1562, 8 L.Ed.2d 505 (1962)):
 
 
 40
 "Nothing is better established in the law of marine insurance than that 'a mistake or commission material to a marine risk, whether it be wilful or accidental, or result from mistake, negligence or voluntary ignorance, avoids the policy, and the same rule obtains, even though the insured did not suppose the fact to be material.' 3 Couch Insurance, at page 25Sec. And it is stated in 29 American Jurisprudence, Insurance, at page 956: 'Sec. 690.--In Case of Marine Insurance.--'Concealment,' in the law of marine insurance, is the failure to disclose any material fact or circumstance in relation to the subject matter of the contract which may increase the liability to loss, or affect the risk or obligation assumed, and which is, in fact or law, within or ought to be within, the knowledge of one party, and of which the other party has no actual or presumptive knowledge. In the case of marine insurance the insured must disclose all facts material to the risk, and in default of such duty the contract may be avoided by the insurer. In other words, an applicant for marine insurance must state all material facts which are known to him and unknown to the insurer. It has been said that the insured is bound to communicate every material fact within his knowledge not known or presumed to be known to the underwriter, whether inquired for or not; and that a failure in either particular, although it may arise from mistake, accident, or forgetfulness, is attended with the rigorous consequences that the policy never attaches and is void, for the reason that the risk assumed is not the one intended to be assumed by the parties."
 
 
 41
 See also G. Gilmore & C. Black, Law of Admiralty 62 (2d ed. 1975) ("The marine insurance contract is uberrimae fidei --the highest degree of good faith is exacted of those entering it, for the underwriter often has no practicable means of checking on either the accuracy or the sufficiency of the facts furnished him by the assured before the risk is accepted and the premium and conditions set.").
 
 
 42
 Steelmet and MEC rely on several cases for the proposition that knowledge of unseaworthiness does not void a P & I policy, unlike a hull policy, when those facts are not communicated to the insurer even if the ship is ultimately liable to the cargo owing to a sinking caused by unseaworthiness. See Hanover Fire Insurance Co. v. Merchants' Transportation Co., 15 F.2d 946, 948 (9th Cir.1926) (failure to communicate a material fact at inception of policy about the condition of the vessel does not void a P & I policy unless failure to communicate amounts to fraud, at least where no inquiry was made by the insurer); Sorenson v. Boston Insurance Co., 20 F.2d 640, 643 (4th Cir.1927) (knowledge of unseaworthiness by insured during existence of policy does not void policy unless it amounts to a willful, deliberate, and intentional wrong).
 
 
 43
 We are unwilling to formulate a rule for P & I policies absent binding factual development in the district court. Because this case must be remanded for factfinding and a new trial, we leave resolution of this legal issue to the district court in the first instance once it has developed the relevant facts.
 
 IV. Other issues
 
 44
 Steelmet filed a direct action against the insurers, but the district court never ruled on its ability to do so. The court allowed Steelmet to participate as if it had a direct action. Steelmet contends that it is entitled to bring a direct action under Florida law in this maritime action. We agree.
 
 
 45
 Where state law allows a direct action against the insurer, that action can be maintained in the maritime action in federal court. See Olympic Towing Corp. v. Nebel Towing Co., 419 F.2d 230, 236-37 (5th Cir.1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970). Florida law recognizes the plaintiff as a third party beneficiary of liability and protection and indemnity policies and gives him the right to sue the insurer directly. See Shingleton v. Bussey, 223 So.2d 713, 716 (Fla.1969) ("third party beneficiary doctrine encompasses, substantively speaking, a cause of action against an insurer in favor of members of the public injured through the acts of an insured"); Quinones v. Coral Rock, Inc., 258 So.2d 485, 486 (Fla.Dist.Ct.App.1972) (application of rule to P & I policy). Steelmet is entitled to pursue its action against the insurers on remand.
 
 
 46
 The insurers argue that MEC cannot be liable to Steelmet, and thus the insurers not liable to MEC, because MEC neither owned, operated, nor chartered the tug or barge. The insurers say that the trial court was clearly erroneous in finding that MEC was beneficial owner of the barge and tug and assignee of the charter party from Caribe Towing. This contention is meritless. Although formal title passed after November 24, the trial court determined that the corporate reorganization of MEC to acquire Caribe occurred before that date and that the MEC directors communicated acceptance of the tug at their meeting of November 23. Perhaps most significantly, MEC believed it owned the tug and was assignee of the charter because before the ship sailed MEC added the barge and tug to its insurance policy. The district court did not clearly err in finding that MEC beneficially owned the tug and barge and was assignee of the Steelmet charter.
 
 
 47
 Steelmet argues for the first time on appeal that on remand the district court should determine the priority of Steelmet and Jackson in the funds arising out of the sale of the tug after its arrest in rem. Jackson had a ship's mortgage, and the district court held he was entitled to the amount of his mortgage from those funds. Apparently Steelmet did not raise the issue of priorities below. Steelmet now questions those priorities.
 
 
 48
 An appellate court will not consider for the first time on appeal a question that involves development of factual issues. See Hall v. Board of School Commissioners, 681 F.2d 965, 969-70 (5th Cir.1982) (Unit B). This is such a question. We do not consider it.
 
 
 49
 REVERSED and REMANDED. Jurisdiction is retained, however, on the issue of attorneys' fees.
 
 
 
 [1]
 This background comes largely from the findings of the arbitrators, discussed in Part III and adopted as binding by the district court. We recognize that at a new trial different facts may emerge