842 F.2d 1237
 STEELMET, INC., et al., Plaintiff-Appellee, Cross-Appellant,
Jarrell R. Jackson, Intervening Plaintiff,
v.
CARIBE TOWING CORPORATION, et al., Defendants-Appellees.
MARINE EXPLORATION COMPANY, INC., Third-Party Plaintiff-Appellee,
v.
FRANK B. HALL AND COMPANY, American Marine Underwriters,
Third-Party Defendants
Calvert Fire Insurance Company, Third Party
Defendant-Appellant, Cross- Appellee.
ALABAMA-PUERTO RICO BARGE LINES, INC., Plaintiff-Appellee,
v.
CALVERT FIRE INSURANCE COMPANY, Defendant-Appellant.
 Nos. 86-5937, 86-5939.
 United States Court of Appeals,
Eleventh Circuit.
 April 18, 1988.
 
 C. Robert Murray, Jr., Canning & Murray, P.A., Richard R. McCormack, Miami, Fla., for Calvert.
 John B. Culp, Jr., Jacksonville, Fla., for Alliance, et al.
 Edward F. Gerace, Tampa, Fla., for Caribe.
 John W. Keller, III, Miami, Fla., for Alabama-Puerto Rico Barge Lines, Inc.
 Appeals from the United States District Court for the Southern District of Florida.
 Before HILL, Circuit Judge, HENDERSON*, Senior Circuit Judge, and VINING**, District Judge.
 HILL, Circuit Judge:
 
 
 1
 The long voyage of the tug CARIBE and barge ATC-21 is now nearly at an end. In this appeal, insurers challenge the judgment against them for the loss of the tug, barge, and cargo. In turn, the plaintiffs cross-appeal challenging the amount of the award. We affirm in part, reverse in part, and remand to the district court for final calculation of the awards.
 
 I. BACKGROUND
 
 2
 The background of this case is set forth fully in Steelmet, Inc. v. Caribe Towing Corp., 747 F.2d 689 (11th Cir.1984) (Steelmet I ). To summarize briefly, Steelmet, Inc. entered into a charter party with Caribe Towing Corporation for the shipment of steel bars. The cargo was to be carried by the tug CARIBE and the barge ATC-21. Marine Exploration Company (MEC) then became beneficial owner of the tug and barge and assignee of the charter party. The vessel hit rough seas in the Caribbean, and the barge sank with the cargo.
 
 
 3
 Steelmet brought suit in the district court against Caribe and MEC and, pursuant to the charter agreement, the matter was referred to arbitration. The arbitrators found that the vessel was unseaworthy when it left Tampa and issued an award in favor of Steelmet. Steelmet then moved to enforce the award in the district court. In addition, MEC filed a third party complaint against its insurers, American Marine Underwriters (AMU) and Calvert Fire Insurance Company, under its hull and protection and indemnity (P & I) policies. Steelmet also sought to file a direct action against the insurers. The district court entered judgment on the arbitration award on November 24, 1982 in favor of Steelmet. The court also held that MEC and Steelmet were precluded from relitigating the issues decided in the arbitration. Because the arbitration found that MEC was aware of facts regarding the vessel's unseaworthiness, the court held that the insurance coverage, which was obtained just prior to the start of the voyage, was voided for failure to disclose this information to the insurers. In addition, the court awarded against MEC and in favor of Jarrell Jackson, an intervening complainant, the amount of Jackson's mortgage on the tug, which had been seized and sold by United States Marshals.
 
 
 4
 In the first appeal, this court held that the insurers could not offensively estop Steelmet and MEC on the issues relating to insurance coverage because the burden of proof was placed on the insurers in the district court action and on the shipper in the arbitration. The court remanded the case for trial on the MEC's third party action and Steelmet's direct action against the insurers. The first appeal did not alter the judgment entered against MEC and Caribe on the arbitration award.
 
 
 5
 On remand the district court found that the record was complete. The only new evidence accepted was the conviction of Captain Rosenbrock, a key witness for the insurers, under 18 U.S.C. Sec. 1542 for making a false statement in a passport application. On May 27, 1986 the district court issued its decision finding the insurers liable. It concluded that neither MEC nor Caribe was aware of any material information which they were obliged to disclose to the insurers. With the burden of proof now on the insurers, the court found, contrary to the arbitrators' decision, that the loss was caused by a peril of the sea. On October 16, 1986 the district court entered judgment granting the following:
 
 
 6
 Steelmet is awarded $876,277.38 ($501,807.38 invoice value plus interest) against Calvert on the protection and indemnity policy.
 
 
 7
 Alliance Assurance Company, Ltd., subrogee of Steelmet, is awarded $876,277.38 against Calvert on the protection and indemnity policy.
 
 
 8
 MEC is awarded $876,277.38 plus attorneys' fees in the amount of $50,000 against Calvert on the protection and indemnity policy.
 
 
 9
 MEC is awarded $176,500 against Calvert on the hull policy on the tug ($200,000 policy less $23,500 proceeds from Marshals' sale) plus interest of $132,904, but subject to the judgment lien in favor of Jackson in the amount of $79,126.33.
 
 
 10
 MEC is awarded $200,000 on the hull policy on the barge plus interest of $149,250, but subject to the claim of Alabama-Puerto Rico Barge Line, Inc. as loss payee. Alabama's right to recover is established by a judgment entered simultaneously.
 
 
 11
 Calvert appeals from the judgment challenging several aspects of the district court's decision and award. Alliance, Steelmet's subrogee, cross-appeals challenging the amount of the award.
 
 II. DISCUSSION
 A. The Law of the Case
 
 12
 Calvert first attempts to rely upon the district court's finding that the loss was caused by a peril of the sea to assert that MEC, its insured, is not liable to Steelmet. This argument fails to recognize that MEC's liability was established when the district court entered judgment in favor of Steelmet on the arbitration award in 1982. As noted above, that judgment was unaffected by this court's decision in Steelmet I. The district court's subsequent finding, based upon an appropriate placement of the burden of proof, that the loss was caused by a peril of the sea relates only to Calvert's asserted defense that the policy was voided for nondisclosure. The finding does not affect MEC's liability to Steelmet.
 
 
 13
 Calvert also attempts to reargue the issues of estoppel which were resolved in Steelmet I. It argues that the arbitrators' findings and the positions taken in the arbitration preclude MEC and Steelmet from taking the positions they now take regarding the vessel's seaworthiness and the carriers' knowledge of it. This issue is governed by the law of the case. In Steelmet I the parties fully argued the preclusion issue, including the question of judicial estoppel, and this court held that Steelmet and MEC were entitled to try their actions anew against the insurers. Steelmet I, 747 F.2d at 694. That holding authorized the parties' adoption of the positions they now assert, and it contemplated the possibility that the district court's findings might differ from the arbitrators' findings. That is the law of the case by which we are bound. See Wheeler v. City of Pleasant Grove, 746 F.2d 1437, 1440 (11th Cir.1984).
 
 B. Failure to Disclose
 
 14
 Calvert challenges the district court's finding that no official of MEC or Caribe was aware of any facts material to the vessel's seaworthiness that were not disclosed. This is a factual issue and we may not overturn the district court's findings on this question unless they are clearly erroneous. See Fed.R.Civ.P. 52(a).[1] We conclude that those findings were not clearly erroneous.
 
 
 15
 The main issue in this case is whether the "boom and bubble" incident which allegedly occurred during the loading on November 22, 1976, was material to the vessel's seaworthiness, and therefore should have been disclosed.[2] Calvert contends that the incident was very significant, that it affected the vessel's seaworthiness, and that at the very least it should have been revealed to the insurers prior to the issuance of coverage. In support of this contention, Calvert relies on the description of the boom and bubble incident given by Captain Rosenbrock.
 
 
 16
 According to Rosenbrock, at some point during the loading of the steel cargo on November 22 a loud boom occurred. He claims that he then saw large air bubbles surfacing from underneath the barge. Rosenbrock describes the event as having considerable significance. He claims that he made two separate requests to Ron Zapetis, president of Caribe Towing, for divers to inspect the underside of the barge. He also claims that he noted in his log book that he thought the barge had either hit bottom or broken her back. Based upon Rosenbrock's description of the event, Calvert argues that the incident should have been disclosed.
 
 
 17
 It is clear that the district court did not credit Rosenbrock's testimony regarding the incident. We believe that this was with good reason. First, shortly after the sinking of the barge Rosenbrock gave two written statements in which he described the loading and the voyage, but in which he did not mention the boom and bubble incident. Those statements reflect Rosenbrock's belief that the barge left Tampa in normal condition and that the sinking was caused by rough seas. Second, while Rosenbrock claims that he requested divers to inspect the barge, Ron Zapetis testified that he made no such request. Third, the log books where Rosenbrock claims to have made an entry regarding the incident were not produced for the court. And finally, Rosenbrock was convicted of a crime involving false statements, and he testified that he had been convicted of forgery.
 
 
 18
 Given this background, one would be hard put to credit the late report of Rosenbrock concerning the boom and bubble incident and its significance. On appeal, we certainly cannot fault the district judge for his having discounted it almost entirely. The record suggests that Rosenbrock simply changed his story when he perceived that he was to be blamed for the loss. Given this concern, along with the benefit of hindsight, the boom and bubble incident apparently took on enhanced significance in Rosenbrock' mind over time.
 
 
 19
 Once Rosenbrock's testimony is discounted, there is little or no reason to believe that anything occurred during the loading which should have been disclosed. There is, in fact, substantial evidence to support the conclusion that nothing unusual occurred during the loading, that the vessel set sail in normal condition, and that the loss was caused by rough seas. Thus, we hold that the district court's finding that no material facts were kept from the insurers was not clearly erroneous.[3]
 
 C. The Protection and Indemnity Limit
 
 20
 Under MEC's protection and indemnity policy, the barge ATC-21 was insured up to $200,000 and the tug CARIBE was insured up to $500,000. Calvert argues that its liability under the P & I policy is limited to $200,000 because it was the barge that sank with the cargo and because the arbitrators found the barge to be unseaworthy. We disagree.
 
 
 21
 Calvert's liability to MEC and Alliance is, of course, rooted in the insurance policies. Therefore, the starting point for determining the applicable P & I limit is with the language of the P & I policy itself. See National Union Fire Ins. Co. of Pa. v. Carib Aviation, Inc., 759 F.2d 873, 875-76 (11th Cir.1985). Clause A of the policy states: "this Company hereby undertakes to pay up to the amount hereby insured such sums as the Assured, in respect of the vessels listed on the 'Schedule of Vessels,' shall have become legally liable to pay...." The question for the court then is whether MEC's liability to Steelmet is "in respect of" the barge and tug together or simply the barge. To determine the answer to this question we must look to the source of MEC's liability to Steelmet: the arbitration award on which the district court entered judgment. The arbitrators stated the following:
 
 
 22
 Clause 37 [of the charter party] defines the word 'vessel' to mean both the Barge and Tug. Therefore, when applying COGSA to the specifics of this dispute, the Panel must necessarily view the combination of Barge and Tug as a single entity for the determination of seaworthiness and the measurement of Owners' due diligence effort.
 
 
 23
 (R2-158-13). The arbitrators' award makes it clear that MEC's liability arises out of a decision that treated the tug and barge as one unit for purposes of assessing MEC's behavior and issuing an award.
 
 
 24
 The arbitrators' treatment of the barge and tug combination is supported by common sense and the law. The Supreme Court has said the following:
 
 
 25
 The bill of lading declares that the cargo was shipped on board the barge. But it was to be transported; and this the barge alone was incapable of doing, since she had no power of self-movement. It results, necessarily, that it was within the contemplation of the contract that the transportation would be accomplished by combining the barge with a vessel having such power.
 
 
 26
 ....
 
 
 27
 ... This court and other federal courts repeatedly have held that such a combination [of barge and tug] constitutes, in Law, one vessel.
 
 
 28
 Sacremento Navig. Co. v. Salz, 273 U.S. 326, 328-30, 47 S.Ct. 368, 369-70, 71 L.Ed. 663 (1927) (original emphasis). It appears that the loss in the present case would never have occurred if the barge and tug, together, had not set sail from Tampa.
 
 
 29
 Given that the arbitration award is the source of MEC's liability and that the arbitrators viewed the tug and barge combination as one vessel, we conclude that MEC's liability arose "in respect of" both the tug and barge. The P & I policy provides $200,000 of coverage for the barge and $500,000 of coverage for the tug. Since MEC's liability is "in respect of" both the barge and tug, the total coverage under the P & I policy is $700,000 for this loss.
 
 D. Alabama as Loss Payee
 
 30
 The district court entered judgment in favor of Alabama-Puerto Rico Barge Lines, Inc. (Alabama) under the hull policy on the barge because Alabama was listed as loss payee on the policy.
 
 
 31
 Calvert argues that Alabama may not recover as loss payee under the barge's hull policy because MEC failed to disclose that the barge was having trouble in rough seas at the time Alabama was added as loss payee. We disagree with Calvert's contention that the failure to make such a disclosure affects the validity of a change of the loss payee.[4] The law requires only that the insured inform the insurer of its intent to change the payee in a manner consistent with policy or statutory requirements. See 5 G. Couch, Insurance Secs. 28:51-28:58 (Rev. ed. 1984). Calvert does not contend that the correct procedures were not followed, and we presume that they were. We conclude then that the addition of Alabama as loss payee was proper and effective.[5]
 
 E. Hull Policy on the Tug
 
 32
 The district court also entered an award in favor of MEC under the hull policy on the tug, subject to the mortgage claim of Jarrell Jackson. Calvert contends that the loss of the tug was not caused by a covered peril and that the award must be reversed. We agree.
 
 
 33
 The tug was arrested and sold by United States Marshals for $23,500 under circumstances which are not entirely clear from the record. What is clear, however, is that this was not a peril against which the tug was insured. The policy listed the following covered perils: "the waters named herein, fire, lightning, explosion, earthquake, assailing thieves, jettisons, barratry of the master and mariners and all other like perils...." As MEC concedes, U.S. Marshals are not listed as a covered peril. Clearly this court is not authorized to rewrite the policy to extend coverage to this loss. See National Union Fire, 759 F.2d at 875-76 (court is not free to rewrite insurance policy or add meaning that is not there). Therefore, the judgment against Calvert under the hull policy on the tug is reversed.[6]
 
 F. The Awards
 
 34
 On cross-appeal, Alliance contends that the district court wrongly disregarded the 1982 judgment in calculating the awards,[7] and Calvert contends that it is not liable for interest above the P & I policy limit. We find that there is merit in both claims.
 
 
 35
 Prior to the first appeal, the district court entered judgment on November 24, 1982 against MEC and Caribe Towing in the amount of $933,129.19. That judgment was based upon the arbitrators' award and it was not affected by this court's opinion in Steelmet I. On remand the district court did not alter that judgment and, in fact, noted in its decision of May 27, 1986 that the original judgment remained valid following the appeal. We conclude that that award was proper, that it was unaffected by the actions against the insurers, and that post-judgment interest has been accumulating on that award from November 24, 1982 pursuant to 28 U.S.C. Sec. 1961. See Gele v. Wilson, 616 F.2d 146, 148 (5th Cir.1980) (post-judgment interest provision applicable in admiralty as in other civil litigation).
 
 
 36
 Following the remand in Steelmet I the sole issue before the district court was the insurers' liability. The court held that the P & I policy was not voided for failure to disclose and that Calvert was liable under the P & I policy to MEC, Steelmet, and Alliance as subrogee of Steelmet.[8] In calculating the award under the P & I policy, however, the district court disregarded the 1982 judgment. The court calculated the award by using the invoice value of the lost cargo ($501,807.38) and adding prejudgment interest from the date of loss on December 8, 1976. This was error.
 
 
 37
 Calvert's liability under the P & I policy arises from the judgment entered against its insured, MEC. That is the nature of liability insurance. The starting point then for calculating Calvert's liability under the P & I policy is the 1982 judgment rendered against MEC. That judgment was for $933,129.19, including $415,647.05 in interest. Thus, if the P & I policy had no relevant limit, Calvert's liability would be equal to the total amount of the 1982 judgment, plus interest. As determined above, however, Calvert's liability under the P & I policy was limited to $700,000 for this event. We must, therefore, evaluate the effect of this limit on the amount of the award.
 
 
 38
 As noted above, the district court's award against Calvert, as well as its original award against MEC, included prejudgment interest. The law is clear that prejudgment interest should generally be awarded in admiralty cases absent peculiar circumstances, and that the decision of whether to make the award is left to the trial court's discretion. Chung, Yong Il v. Overseas Navigation Co., 774 F.2d 1043, 1056-57 (11th Cir.1985), cert. denied, 475 U.S. 147, 106 S.Ct. 1802, 90 L.Ed.2d 346 (1986); Miller Industries v. Caterpillar Tractor Co., 733 F.2d 813, 822 (11th Cir.1984). While the existence of a genuine dispute is one "peculiar circumstance" that may justify denying prejudgment interest, see Parker Towing Co. v. Yazoo River Towing, Inc., 794 F.2d 591, 594 (11th Cir.1986), the district judge in this case was most familiar with the parties and issues, and we cannot say that his award of prejudgment interest, as a general matter, was an abuse of discretion.
 
 
 39
 With respect to the prejudgment interest included in the 1982 judgment against MEC, however, we conclude that Calvert may not be held liable for this under the P & I policy to the extent that the judgment exceeded the $700,000 policy limit. In the P & I policy, Calvert agreed to the following: "to pay up to the amount hereby insured such sums as the Assured ... shall have become legally liable to pay...." A liability policy such as this implicitly contemplates that a period of time may pass between the loss and the point at which the insured is held liable for the loss. The policy insures against liability not loss, and it insures only against liability up to the policy limit. We find nothing in the policy to indicate that Calvert undertook to pay interest above its limit. Thus, Calvert's liability under the P & I policy as of November 24, 1982, the date on which MEC became "legally liable to pay," was limited to $700,000. See Ryan Walsh Stevedoring Co. v. James Marine Services, Inc., 792 F.2d 489, 493 (5th Cir.1986) ("A marine insurer is not liable for interest in excess of its policy limits unless language in the policy so provides."); Alcoa Steamship Co., Inc. v. Charles Ferran & Co., Inc., 443 F.2d 250, 255 (5th Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 94 (1971) ("The case law in non-marine policies is generally consistent in disallowing interest in excess of the dollar policy limits unless the policy contains language which provides for interest."); Beck v. Kelly, 323 So.2d 667, 668 (Fla.App.1975) (insurer liable for judgment in excess of policy limit only where it exhibits bad faith in handling the defense or claim).
 
 
 40
 It is a distinct question, however, as to whether Calvert is liable for interest accumulated on the $700,000 after the date of the 1982 judgment. We conclude that it is liable for that interest. Under Florida law,[9] a liability insurers' obligation to pay under a liability policy arises when the insured is held liable. See Stuyvesant Ins. Co. v. Bournazian, 342 So.2d 471, 473 (Fla.1977); Allstate Ins. Co. v. Warren, 125 So.2d 886, 889 (Fla.App.1961). In Stuyvesant, 342 So.2d at 473, the Supreme Court of Florida held that the verdict in a trial involving the insureds "brought into effect the duty of each liability insurer to pay what its insured owed." While that decision involved an interpretation of the "liability insurance" statutory provision rather than the "marine protection and indemnity insurance" provision, the pertinent language of the provisions is the same. Compare Fla.St. Sec. 624.605(1)(b) with Fla.St. Sec. 624.607(1)(b). Both provisions describe insurance "against legal liability." Thus, we conclude that Calvert's obligation to pay arose on November 24, 1982, when MEC was held liable. Given that its obligation to pay arose in 1982, Calvert cannot escape paying interest on its $700,000 obligation after that date. The policy limit does not excuse Calvert from paying interest on that obligation. Were it otherwise, an insurer would have no incentive to promptly fulfil its obligation to pay so long as the policy limit had been reached. While an insurer is free to contend that it is not liable under the policy, as Calvert has done for several years, the insurer must pay the cost of the delay in the form of interest. This interest is simply compensation for the use of funds which Calvert was obligated to pay as of November 24, 1982. See Chung, Yong Il, 774 F.2d at 1057. Thus, on remand, the final award against Calvert under the P & I policy should be $700,000 plus interest on that amount from November 24, 1982.[10]
 
 
 41
 Calvert does not specifically challenge the award of $50,000 in attorney's fees to MEC. We find that that award was proper and it is affirmed.
 
 
 42
 As discussed above, the judgment in favor of Alabama on the hull policy on the barge was proper. Moreover, it is clear that Calvert is liable for interest on the $200,000 policy amount because its obligation to pay arose at the time of the loss, rather than at the point when MEC was held liable.
 
 
 43
 We have held that the judgment in favor of MEC under the hull policy on the tug was error and it is reversed. Jackson's mortgage on the tug, however, is not in dispute and it is unaffected by this opinion.
 
 
 44
 The insured, MEC, has also moved this court for an award of attorney's fees on appeal pursuant to Fla.Stat.Ann. Sec. 627.428. This statute is applicable in federal court, see Blasser Bros., Inc. v. Northern Pan-American Line, 628 F.2d 376, 386 (5th Cir.1980), and an insured is entitled to an award of fees even where both parties obtain some relief in the appellate court. See Great Southwest Fire Ins. Co. v. DeWitt, 458 So.2d 398, 400 (Fla.App.1984). We conclude that MEC is entitled to recover a portion of its appellate fees under Florida law. We therefore "instruct the trial court to take evidence and fashion an equitable award of appellate fees...." DeWitt, 458 So.2d at 400. The district court should, of course, take into consideration in fashioning an award the partial success of Calvert in this appeal.
 
 III. CONCLUSION
 
 45
 For the reasons stated above, the judgment of the district court is affirmed in part and reversed in part. We remand only for final calculation of the awards consistent with this opinion.
 
 
 46
 AFFIRMED in part; REVERSED in part; and REMANDED.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable Robert L. Vining, Jr., U.S. District Judge for the Northern District of Georgia, sitting by designation
 
 
 [1]
 Calvert asserts that the standard of review should be somewhat less deferential because the evidence is largely documentary. We disagree: "[t]he rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Moreover, Rule 52(a) clearly states that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous...."
 
 
 [2]
 In addition to the boom and bubble incident, Calvert argues that the results of an inspection by the National Cargo Bureau which took place on November 21, 1976 should have been disclosed. While the district court did not specifically address this matter, it is clear that the survey was not material to the barge's seaworthiness. The surveyor testified that his survey was limited to a visual inspection of the cargo hold, and that it had no bearing on the barge's seaworthiness. The district court's unstated conclusion that this inspection was not material to the risks assumed was not clearly erroneous
 
 
 [3]
 The court in Steelmet I, 747 F.2d at 695-96, declined to resolve the conflict between the general rule of marine insurance requiring full disclosure and a line of cases indicating that the rule applies only to hull policies and not to P & I policies unless the failure to disclose amounts to fraud or gross negligence. Because we uphold the district court's finding that MEC did not fail to disclose any material fact it is not necessary to resolve the conflict in this case. Under either rule there was no breach of the duty to disclose because there was nothing to disclose
 
 
 [4]
 While the law is clear that a failure to disclose material facts at the time the insurance attaches will void the policy, see Gulfstream Cargo, Ltd. v. Reliance Ins. Co., 409 F.2d 974, 983 (5th Cir.1969), the insurance did not attach here when Alabama was added as loss payee
 
 
 [5]
 Calvert also contends that the barge was unseaworthy when Alabama was added as loss payee, and that MEC therefore breached its warranty of seaworthiness. This contention, however, relies upon the false premise that a seaworthy vessel cannot encounter trouble or sink. In the action against the insurers, the district court specifically found that the barge sank due to a peril of the sea, and not because it was unseaworthy. Thus, the fact that the barge was encountering serious difficulty in rough seas when Alabama was added as loss payee does not indicate that MEC breached its warranty of seaworthiness
 
 
 [6]
 MEC suggests that the award should be upheld as an element of the damages caused by Calvert's failure to defend MEC against Steelmet. MEC claims that the seizure and sale would not have occurred if Calvert had promptly taken up the defense. It is clear, however, that the district court granted the award based upon the hull policy, and we decline to speculate on appeal as to whether Calvert's failure to defend was the cause of the seizure. The district court specifically dealt with Calvert's failure to defend by awarding MEC attorneys' fees, and we find no reason to enhance that award on appeal
 
 
 [7]
 Calvert argues that Alliance is not entitled to rely on the judgment entered on November 24, 1982 in favor of Steelmet because Alliance was not named in the judgment. Since Alliance formally ratified the commencement of the action pursuant to Fed.R.Civ.P. 17(a) in 1981, however, this argument is without merit. Calvert's counsel conceded that Alliance was the real party in interest, and the ratification has "the same effect as if the action had been commenced in the name of the real party in interest." Fed.R.Civ.P. 17(a)
 
 
 [8]
 The judgment assumes, of course, that only one party may recover this award from Calvert under the P & I policy
 
 
 [9]
 The applicability of Florida law is not in dispute: "admiralty courts will generally look to appropriate state law in determining questions involving a marine insurance contract." Gulf Tampa Drydock Co. v. Great Atlantic Ins. Co., 757 F.2d 1172, 1174 (11th Cir.1985). The parties agree that Florida law is the "appropriate" state law
 
 
 [10]
 Calvert is not liable for interest on the entire $933,129.19 judgment entered against MEC, but only on the $700,000 which it was obligated to pay. An insurer is liable for interest on the entire judgment, regardless of the policy limit, only where the language in the policy specifies that the insurer will pay "all interest accruing after entry of judgment until the company has paid...." United States Automobile Ass'n v. Russom, 241 F.2d 296, 303 (5th Cir.1957); Allegheny Airlines, Inc. v. Forth Corp., 663 F.2d 751, 855-56 (7th Cir.1981). The P & I policy here did not include such language