**JOSEPH NAVIGATION CORP.,**
**Plaintiff,**

v.

**Arthur Henry CHESTER et al., Defendants,**

**and**

**Ametco Shipping, Inc., Intervening-Plaintiff.**

No. 72 Civ. 391.

United States District Court, S. D. New York.

Dec. 30, 1975.

Hill, Betts & Nash, New York City, for plaintiff; Benjamin E. Haller, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for Intervening plaintiff; Baldvin Einarson, New York City, of counsel.

Symmers, Fish & Warner, New York City, for defendants; William G. Symmers, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

This is an action on a marine insurance policy to recover for the constructive total loss of the insured vessel, the JOSEPH H, which was owned by the plaintiff corporation and insured by the defendants. The intervening plaintiff claims that a certain amount of any such recovery should be paid to it since it held a mortgage on the vessel.

Plaintiff Joseph Navigation Corp. was organized under the laws of Liberia in

October 1968 by Arthur J. Halpern and his mother Mrs. Evelyn Halpern, for the purpose of acquiring title to a cargo vessel to be named the JOSEPH H. The vessel was built in Germany in 1950 and was a small dry cargo ship registered under the Liberian flag. The vessel was purchased by the Joseph Navigation Corp. on November 1, 1960 for $147,500, which was financed in part by a loan from the intervening plaintiff, Ametco Shipping, Inc., and secured by a preferred ship mortgage in the principal sum of $107,500. The rest of the purchase price of the vessel was obtained by a $40,000 unsecured loan from Mrs. Evelyn Halpern.

Between September 11, 1969 and September 13, 1969, the JOSEPH H under the command of Captain Carlos Cabezas, loaded a full cargo of salted cattle hides in Milwaukee, which were to be delivered to Russia. The ship did not sail from Milwaukee until September 21st, and arrived in Montreal on September 28th. The ship proceeded from Montreal headed for Riga on the morning of October 2nd.

While at Montreal six crew members signed off the vessel and five new crew members joined the vessel, including a new chief engineer, a new chief officer and a new third engineer. The new chief officer, Niels Eric Ladefoged, was not licensed as a master or a chief officer but merely held a third officer's license. Captain Cabezas and Mr. Ladefoged were the only deck officers aboard the vessel upon sailing from Montreal. The two deck officers stood watch in six hour shifts; the Captain stood watch from 6 until 12 and Mr. Ladefoged stood watch from 12 until 6.

As indicated above, the vessel broke ground at Montreal on the morning of October 2nd to put out up the St. Lawrence River and for the North Atlantic crossing.

The vessel was equipped with two magnetic compasses. She was also equipped with a fathometer but it was not in working order. Radar for the ship was also not in operating condition and apparently the radar had not been operational for some extended period of time.

As the JOSEPH H was proceeding down the St. Lawrence River, outward bound from Montreal, she encountered engine trouble and in the evening of October 2nd anchored at the entrance to Bic Channel for repairs.

Shortly before 6 o'clock on the morning of October 3rd, Mr. Ladefoged was relieved by Captain Cabezas and Ladefoged retired to his bunk. The log indicates that there was dense fog at that time. The log also indicates that at 6:15 the anchor was weighed and the JOSEPH H proceeded in the foggy weather. At about 7:30, according to the log, the JOSEPH H ran aground on a reef near Bic Island.

Salvage tugs were engaged which after lightening the vessel of some of its cargo of hides, pulled the JOSEPH H free and towed it first to Tadoussac, Quebec, on October 7th, and from there to Quebec City, where the vessel arrived on October 10th. Captain Cabeza shortly thereafter was hospitalized for cancer and on October 17th died. On December 5, 1969, while the vessel still lay at Quebec, plaintiff tendered abandonment to the underwriters, which was refused.

In the meantime, Salvage Association, London, acting on defendant's behalf, inspected the physical condition of the vessel on October 8, 1969, at Tadoussac and on subsequent dates at Quebec. The Salvage Association surveyors reached the following conclusion:

"In assessing this casualty and in the light of the divers' report and the known damages to the vessel it is the opinion of the undersigned that the cost of salvage and repairs would exceed the insured cost of the vessel."

In January 1972, Joseph Navigation Corp. alleging the constructive total loss of the JOSEPH H, in consequence of insured perils, commenced this action against the defendants to recover $300,000, the agreed hull insurance value, plus $75,000, the amount of additional or increased value, total loss only insurance.

In April of 1970, the vessel was sold by judicial sale at Quebec for $6,000.

It is defendants' contention that the damages to the JOSEPH H did not result from insured peril and the defendants have denied that the vessel became a constructive total loss in consequence of the stranding on Bic Island.

While the defendants' contentions in this regard have shifted more rapidly than the sands surrounding the reef near Bic Island, it appears that they may be broken down into the following seven categories:

1) The vessel was unseaworthy in that she was undermanned (in violation of Liberian safety statutes) since she did not have three deck officers plus the captain who would navigate her.

2) The captain of the JOSEPH H and Mr. Ladefoged stood six hour watches in violation of the Liberian statutes.

3) The vessel's radar was inoperable.

4) The vessel's fathometer, for determining her position by reference to depths, was inoperable.

5) The vessel had no gyro compass.

6) The vessel's magnetic compass lacked a deviation card and no proof was offered as to when the magnetic compass had last been adjusted for accuracy or deviation.

7) There was no proof by the plaintiff that the vessel's radio direction finder had been calibrated although the defendant admits that it was operative.

The last contention (number 7) of the defendants was not argued nor even mentioned except for the defendants' post trial memorandum. It assumes that the Court is totally ignorant of electronics and basic navigation equipment. Radio direction finders work on the simple basis of triangulation. It is enough to say that the assumption made by defendants is totally groundless and that the argument is totally specious and indeed almost meaningless.

The defendants also argue that the JOSEPH H was unseaworthy in view of the fact that the plaintiff corporation did not have sufficient monies to sustain the loss and to pay the crew's wages and other claims. It is also claimed by the defendants that the constructive total loss was caused in great part by the plaintiff's failure to promptly make repairs on the vessel and to winterize her after she had been tendered to the underwriters as a constructive total loss.

The operative paragraphs of the insurance policies which define the insured perils are in relevant part as follows:

"Touching the Adventures and Perils which we, the said Underwriters, are contented to bear and take upon us, they are of the Seas, Men-of-War, Fire, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessel, &c., or any part thereof; excepting, however, such of the foregoing Perils as may be excluded by provisions elsewhere in the Policy or by endorsement. . . . And it is expressly declared and agreed that no acts of the Underwriters or Assured in recovering, saving or preserving the property insured shall be considered as a waiver or acceptance of abandonment.

"This insurance also specially to cover (subject to the Average Warranty) loss of or damage to the subject matter insured directly caused by the following:—

\* \* \* \* \* \*

"Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull, excluding the cost and expense of replacing or repairing the defective part);

\* \* \* \* \* \*

"Negligence of Charterers and/or Repairers, provided such Charterers and/or Repairers are not Assured(s) hereunder;

"Negligence of Master, Mariners, Engineers or Pilots;

provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them. Masters, Mates, Engineers, Pilots or Crew not to be considered as part owners within the meaning of this clause should they hold shares in the Vessel."

■ The plaintiff contends that it has shown that the loss of the JOSEPH H was the result of an insured peril of the sea; particularly that covered by the last above quoted clause (which is generally referred to as the "INCHMAREE" coverage.) The evidence is compelling that the master of the JOSEPH H was in full possession of his faculties, and without any sign of disability (although by hindsight we know that he was terminally ill.) He was the one who was in personal charge when the vessel weighed anchor and apparently attempted the passage of the Bic Channel by dead reckoning. There is no evidence that such procedure was poor seamanship. Indeed, this Court must note that it has been an accepted part of navigation since the days of the Phoenicians. In the case at bar there is no suggestion that the Captain of the JOSEPH H, while at the conn, intentionally grounded the vessel. That the grounding of the JOSEPH H was proximately caused by the negligence of "the Master, Mariners, Engineers or Pilots . . ." is clear. This was not gross ineptitude on the part of Captain Cabezas of which the plaintiff had prior knowledge—it was merely a gross error in navigation—something which can be classified solely as negligence such as to come with the INCHMAREE clause of the insurance policy.

■ Assuming that this negligence was the proximate cause of the grounding of the JOSEPH H (which logical proof showed it was,) there is no nexus between the alleged unseaworthiness and the initial damage to the insured vessel. The defendant has tried to convince this Court that the plaintiff has to show the absence of any alleged unseaworthiness before recovery can be had on the insurance policy. The law is not so blind.

The defendants contend that the plaintiff has the burden of proof for showing that the unseaworthiness alleged was not the cause of the stranding of the vessel and its consequent total constructive loss. In making this argument the defendants rely upon The Pennsylvania, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1873), and its progeny. The case of Richelieu Nav. Co. v. Boston Marine Insurance Co., 136 U.S. 408, 10 S.Ct. 934, 34 L.Ed. 398 (1890) is the closest to the factual situation presented here. In the Richelieu case, the Supreme Court said:

"In The Pennsylvania, 86 U.S. 125, 19 Wall. 125 [22 L.Ed. 148], it was held that, where a vessel has committed a positive breach of statute, she must show not only that probably her fault did not contribute to the disaster, but that it could not have done so. And this was but the statement of the settled rule in collision cases. In this case, in view of the seventh section of the Canadian statute [requiring moderate speed in fog], and the fact that perils occasioned by the want of ordinary care and skill or of seaworthiness were excepted by the policy, the same rule is applicable; hence the burden was on the plaintiff to show that neither the speed of the steamer nor the defect of the compass could have caused, or contributed to cause, the stranding." 136 U.S. at 422–23, 10 S.Ct. at 937, 34 L.Ed. at 403.

■ In the instant case the statutory violations alleged were that the vessel was undermanned and that the master and one other stood in six hour watches both of which were in violation of the Liberian safety statutes.

There was no one more qualified to take the JOSEPH H through the Bic Channel on the basis of dead reckoning

than the master of the vessel. The fact that he was starting on a six hour watch had no bearing whatsoever on his competence at that time. Indeed, it would appear that the master of the vessel was fully rested when he ordered the crew to weigh anchor and proceed through the channel.

Even if the most restrictive view of the rule set down in *The Pennsylvania, supra,* be considered as applicable in this case, I find that the alleged unseaworthiness of the ship in this area could not have in any way contributed to the stranding and the resultant loss of the ship.

Certain of the other contentions of defendant relate to the fact that the JOSEPH H was navigating without the benefit of certain technological aids. Nowhere in the policy of insurance nor apparently in the application therefor is there any mention of such devices as radar, fathometer, or gyro compass. The defendants herein relied upon a form of policy which is archaic and yet would seek this Court to read into the ancient language a requirement that the most advanced technological items be on each and every ship. I will not do so.

The form used by the defendants is one which is current practically for each and every vessel plying the seas in international trade. I recognize, and the defendants must also recognize, that many of the vessels covered by this type of insurance might not be equipped with the up-to-date advantages to be found in our space age technology.

The science of navigation was long established prior to even the formulation of the insurance policy in question. If the defendants wish to include the requirement of latter-day technology, then the policy of insurance should have so provided.

The other claims by the defendants are equally without merit. The logical nexus between the claimed unseaworthiness, whether it be for failure to have sufficient monies to pay the crew or the other allegations, and the grounding is totally absent. They must therefore be rejected.

The defendants' claim that the plaintiffs failed to maintain the ship properly after the grounding is also without merit. The plaintiffs claim a total constructive loss on December 5, 1969, the time when the underwriters knew, or should have known, that the claim was correct and should have been honored. The failure of the plaintiffs to winterize the ship thereafter cannot diminish the rights of the plaintiffs which attached as of the time they tendered the vessel.

The liability of the defendants is clear. The amount of the insurance was set by the policy. Judgment will enter for the insured amount along with interest and costs.

Settle judgment on seven days' notice.