**LLOYD'S U.S. CORPORATION, as attorney in fact of the underwriters at Lloyd's U.S., a Texas Lloyd's plan insurer, Plaintiff,**

v.

**Robert D. SMALLWOOD, Jr., and Grace E. Smallwood, his wife, Defendants.**

No. 88–491–CIV–18.

United States District Court,
M.D. Florida,
Orlando Division.

Aug. 23, 1989.

John N.C. Ledbetter, Toole, Bubb & Beale, Jacksonville, Fla., for plaintiff.

Robert Parrish, Taylor, Moseley & Joyner, Jacksonville, Fla., and J.W. Goodloe, Jr. and Thomas E. Sharp, III, Vickers, Riis, Murray and Curran, Mobile, Ala., for defendants.

## ORDER

G. KENDALL SHARP, District Judge.

This case was tried before the court without a jury on April 11–13, 1989. Judgment was entered on April 19, 1989, in favor of defendants in the amount of $175,000.00 with prejudgment interest and postjudgment interest thereon as well as costs. Based upon the testimony and evidence admitted at trial, the facts admitted in the joint pretrial stipulation, and the facts found by the court at trial, the court enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. This order also will address defendants' motion for attorneys' fees (Doc. 28) and plaintiff's motion to strike certain, supporting affidavits accompanying defendants' motion for attorneys' fees (Doc. 32). Both of these motions were filed subsequent to the entry of judgment. Plaintiff has responded to defendants' motion for attorneys' fees (Doc. 30); defendants have not responded to plaintiff's motion to strike.

## FINDINGS OF FACT

This case concerns the insurance coverage on the constructive, total loss of a commercial fishing vessel, co-owned by defendants Robert and Grace Smallwood, and insured by plaintiff Lloyd's U.S. Corporation (Lloyd's). Defendant Robert Smallwood has been engaged in commercial fishing all of his life and in shrimping since 1956. After comparing various shrimp boats, he had the subject vessel, the CAPT. BOB, built to specification by reputable boat builders in Alabama in 1977. Smallwood requested a more enhanced, steel V-hull rather than the typical Southern fishing boat so that the vessel would have greater stability, similar to a sailboat.

In February, 1986, Smallwood applied to Barnhardt Marine Insurance, Inc. in Jacksonville, Florida, for hull and liability insurance. He dealt with Frank L. Barnhardt, owner/president of the insurance corporation. Regarding the use and navigation limits, the application states, "Shrimp–Cape Kenedy [sic] to Brownsville Texas mostly

Key West area." Smallwood requested $175,000.00 hull insurance and $300,000.00 protection and indemnity coverage. Smallwood's original marine insurance, acquired through Barnhardt, was not with Lloyd's.

Also in February, 1986, Jackson and Associates Marine Surveyors of Key West, Florida, prepared a condition and valuation survey on the CAPT. BOB. The market value is stated as $200,000.00, and the replacement value for a new vessel in 1986 as $350,000. In addition to enumerating the equipment on the CAPT. BOB, the survey generally describes the condition of the subject vessel as clean, well painted, and mostly owner operated. Note is made that housekeeping, structure, protective coatings and machinery were "Good." The principal surveyor commented as follows: "The subject vessel is designed for and in service as standard built, steel hull, stern trawling, double rigged commercial Shrimp Fishing Trawler. Captain/Owner Robert Smallwood Jr. is an experienced Fisherman, Operator and Shrimp Boat Owner, having owned other vessels prior to the Capt. Bob. Over 20 years."

In December, 1987, Smallwood decided that he wanted to convert his shrimp trawler into a scallop boat or scalloper. Scallops are loaded on deck while shrimp are loaded below deck. The principal equipment modification in transforming a shrimp boat into a scalloper is changing the nets. Testimony clarified that there are no scallop boats per se, only shrimp boats converted into scallop boats. Smallwood testified that he called Barnhardt to ascertain whether his insurance covered using his vessel for scalloping before he invested the non-refundable amount of $6,000.00 for the purchase of scallop nets. (Trial Transcript at 195–96).

From a telephone near the docks at Cape Canaveral, Smallwood, with his wife standing by, called Barnhardt at his office. Smallwood testified that he would not have gone into scalloping unless he was insured, and that Barnhardt told him that there would be no difference in insurance coverage. (Trial Transcript at 196). Defendant Grace Smallwood testified that she had a pen and paper to record any instructions from Barnhardt, and that she took no notes. (Trial Transcript at 561).

Frank Barnhardt, the sole agent for plaintiff Lloyd's has been contradictory in his recollection of Smallwood's call. His May 24, 1988, post-capsize and post-claim facsimile message to Lloyd's and his September 26, 1988 affidavit state that he does not remember Smallwood's December, 1987 call inquiring as to his insurance coverage if he converted his shrimp boat into a scalloper. Had such a call occurred, Barnhardt claims in these documents, he would have told Smallwood that a deck-load analysis would be required for insurance coverage. He also admitted that he was uncertain as to what was involved in a deck-load analysis. (Trial Transcript at 467).

At trial, Barnhardt admitted the telephone conversation in which Smallwood informed him that he wanted to convert his shrimp boat into a scalloper. (Trial Transcript at 459, 461, 466). Although Barnhardt testified that he advised Smallwood that a deck-load analysis was required, he did not remember whether he told Smallwood that he must provide Barnhardt's office with a copy of the deck-load analysis before he could commence scalloping. Barnhardt wrote Smallwood a letter on February 9, 1988, stating that the insurance on the CAPT. BOB would renew on February 15, 1988. Barnhardt quoted Smallwood pertinent coverage of $175,000.00 on the hull and machinery, and a handwritten notation indicates an additional $100,000.00 excess protection and indemnity. On the letter, an underscored, handwritten notation states, "2/10/88 Renew per Mr. Smallwood." The letter does not mention any qualifications for the type of fishing done on the CAPT. BOB.

Plaintiff's expert Andrew Lebet, a naval architect, knowledgeable concerning the design and stability of boats, testified that a deck-load analysis is a stability test to determine maximum deck loading. He explained that piling great weight on deck raises the center of gravity. On cross examination, he admitted that he made no specific calculations as to the shifting of the center of gravity on the CAPT. BOB.

(Trial Transcript at 393). While Lebet also admitted that his opinions were derived from looking at pictures of the capsize of the boat and the 1986 survey and that he had no first-hand knowledge of the CAPT. BOB, his testimony as to general stability principles substantiated the court's findings. (Trial Transcript at 318, 336, 389–90).

Based upon assurances that Smallwood received when he called Barnhardt in December, 1987, he made the necessary modifications to convert his shrimp boat into a scallop boat. Smallwood testified that he called Barnhardt's secretary, through whom he had received information during his business relationship with Barnhardt, in order to verify his coverage for scalloping in connection with his February, 1988 insurance renewal for the CAPT. BOB. (Trial Transcript at 572). Furthermore, the certificate of documentation for the CAPT. BOB designates "NONE" under restrictions and remarks, and documents the vessel for "FISHING."

Barnhardt testified that he changed insurance companies to Lloyd's with the February, 1988 renewal of coverage on the CAPT. BOB. The court found that Lloyd's issued the subject policy to Smallwood for the CAPT. BOB with actual knowledge provided to its agent Barnhardt that the vessel would be used as a scalloper and that a deck-load analysis was not provided by Smallwood. The court also found that plaintiff/insurer knew that the center of gravity or stability of the CAPT. BOB changed because of its transformation into a scalloper, but that it was not unseaworthy. The court further found that, even if Barnhardt had told Smallwood that a deck-load analysis was required before the vessel could be insured for scalloping, this advice was a recommendation rather than a condition of insurance coverage since no exception preventing scalloping was ever appended to the policy.

The subject marine insurance policy was issued by Lloyd's through Barnhardt Marine Insurance, Inc. for the year February 15, 1988, to February 15, 1989. The $17,844.00 premium insured the hull and machinery for $175,000.00, and gave $100,-000.00 protection and indemnity and $100,-000.00 excess protection and indemnity. The insured vessel is described as a "1977 80' Steel/Diesel Fishing Vessel 'CAPT. BOB' # 579497." Since there is neither mention in the policy as to the type of fishing done by the CAPT. BOB nor requisite qualifications for particular fishing, the court found that the subject insurance policy contained no restrictions precluding scalloping.

With respect to the policy, two provisions have been used by the parties to advance their respective positions. Plaintiff contends that it is exempt from coverage on the subject policy based on the following warranty of seaworthiness:

Warranted that at the inception of this Policy the Vessel shall be in a seaworthy condition and, thereafter, during the currency of this Policy, the Assured shall exercise due diligence to keep the Vessel seaworthy, and in all respects fit, tight, and properly manned, equipped, and supplied.

While the CAPT. BOB was considered seaworthy at the inception of the policy, Barnhardt testified that it was Smallwood's responsibility to maintain the vessel in a seaworthy condition. (Trial Transcript at 487). Defendants claim coverage pursuant to the policy perils provision, specifically the following Inchmaree clause:

This insurance also specially to cover (subject to the Deductible Average) loss of or damage to:

A. Hull and Machinery, directly caused by the following:

Accidents in loading, discharging or handling or in bunkering;

Accidents in going on or off, or while in drydocks, graving docks, ways, gridirons or pontoons;

Explosions on shipboard or elsewhere;

Contact with aircraft or with any land conveyance.

B. Hull only, directly caused by the following:

Negligence of Master, Charterers, Mariners, Engineers or Pilots.

Provided such loss or damage has not resulted from want of due diligence by

the Assured, the Owners or Managers of the Vessel, or any of them. Masters, Mates, Engineers, Pilots or Crew are not to be considered as part owners within the meaning of this cause should they hold shares in the vessel.

Barnhardt verified that the Inchmaree provision in the subject policy covered crew negligence. (Trial Transcript at 457). Additionally, the following constructive, total loss provision is pertinent to this case:

No recovery for a Constructive Total Loss shall be had hereunder unless the expense of recovering and repairing the Vessel shall exceed the insured value. In ascertaining whether the Vessel is a Constructive Total Loss the insured value shall be taken as the repaired value, and nothing in respect of the damaged or breakup value of the Vessel or wreck shall be taken into account.

Smallwood testified that he was captain of the CAPT. BOB from the time that it was converted into a scalloper until April, 1988, when he employed Paul Pittman to captain the boat. Smallwood hired Pittman because of his scalloping experience. After fishing with Pittman for several months, Smallwood testified that he had never seen him overload his boat with scallops. Smallwood testified that the captain is responsible for maintenance of the vessel when it is out, and that the crew is responsible to the captain. (Trial Transcript at 578). Smallwood was in charge of the shoreside maintenance, and he confirmed that he would not knowingly permit the CAPT. BOB to leave the dock in an unseaworthy condition. (Trial Transcript at 594–95).

Smallwood last saw the CAPT. BOB before the incident in question in this case on the afternoon of May 15, 1988, after it returned to Port Canaveral from scalloping in Key West. He testified that the vessel had the proper waterline and the correct amount of trim, and that the boat generally "looked great to me." (Trial Transcript at 594). Smallwood confirmed the apparent ability of the vessel to catch the same amount of scallops caught in the last three to four months.

Other witnesses familiar with the CAPT. BOB at Port Canaveral also described the condition and appearance of the vessel. Tugboat Captain Richard Decker described the general condition of the CAPT. BOB as "excellent." (Trial Transcript at 50). Otto Marchica, a Port Canaveral shipyard manager, knowledgeable as to the scallop boats there, testified that the CAPT. BOB was "about an eight or a nine ... a good boat" because she was well maintained, made of good steel, "always high and dry," and did not encounter many breakdowns. (Trial Transcript at 406–07). Coast Guard Chief Akin depicted the hull of the subject vessel as being in "outstanding shape" and stated that it appeared to have been in the yard recently. (Trial Transcript at 68). The court found that the CAPT. BOB was in good condition when she departed Port Canaveral on May 16, 1988.

The testimony regarding the times for the departure and return of the CAPT. BOB from her last scalloping trip derived from Lieutenant John Wigger, who conducted the standard Coast Guard investigation of the capsize and interviewed the captain and crew. Notes from Wigger's interviews of the captain and crew as well as statements taken by the Coast Guard following the capsize are part of the official Coast Guard investigation file. Neither Captain Pittman nor any member of the crew testified at trial.

Crew statements indicate that the CAPT. BOB left Port Canaveral at 0200 to 0300 hours on May 16, 1988, started fishing at 0900 hours on that day, and departed the fishing grounds at 0400 hours on May 17, 1988. Wigger testified from his notes from his interview with Captain Pittman that the CAPT. BOB had six inches of freeboard aft from the bumper rail to the water when it left the fishing grounds. (Trial Transcript at 148–49). The court found that the CAPT. BOB was in good condition when it left the scallop grounds on May 17, 1988.

The vessel passed the Port Canaveral sea buoy at 0730 hours on May 17, 1988. At 0900 hours on May 17, 1988, the CAPT. BOB arrived at the Port Canaveral jetties,

where Captain Pittman reported to Lieutenant Wigger that he experienced a list. When the CAPT. BOB reached the entrance to Port Canaveral, the court found that the captain and crew noticed that the stern was low in the water, that a list had developed, and that the outriggers were extended. The court also found that the captain apparently did not consider the condition sufficiently extreme to call for assistance at the time of the list upon entry into Port Canaveral, and that he did not inspect the lazaret, the last storage compartment of the stern, for water intrusion.

The CAPT. BOB proceeded through the channel to the farthermost of the three turning basins at Port Canaveral, the West Basin. Five eyewitnesses to the arrival and subsequent capsize of the CAPT. BOB in the West Basin testified at trial: Coast Guard Chief Albert Akin, tugboat Captain Decker, scalloper owner and manager John Fernandez, Port Canaveral shipyard manager Marchica, and owner Smallwood. Captain Decker and a Coast Guard petty officer took photographs of the arrival and capsize of the CAPT. BOB in the West Basin, and these pictures were admitted as trial exhibits. Upon entry into the West Basin, the shipyard and drydock, the vantage point of Decker, Fernandez, Marchica, and Smallwood, were on the port side of the CAPT. BOB. The Coast Guard station, located at the north corner of the right side of the West Basin, was also on the port side of the vessel. The scallop unloading dock, at the south end of the West Basin, was behind the CAPT. BOB.

When Fernandez initially saw the CAPT. BOB, the outriggers were down and the crew was attempting to raise them as the vessel entered the basin, apparently in accordance with Coast Guard regulations. He noticed the CAPT. BOB because the boat was "floundering" as to stability with her stern "very low" in the water and her bow "extremely high" in "a very unstable manner." (Trial Transcript at 506). Decker testified that the cap rails of the CAPT. BOB were almost under water, that she was "laboring" and "wallowing" in her reactions to maneuvers, and that she was

proceeding "very slow, dead slow." (Trial Transcript at 23–24).

Fernandez testified that the captain should not have attempted to raise the outriggers in this unstable condition "[b]ecause that brings your center of gravity above any stable point." (Trial Transcript at 510). He also testified that the CAPT. BOB could have proceeded safely to the scallop unloading dock had the outriggers not been raised because the vessel "must have traveled thirty some or forty miles in that state to get where she was." (Trial Transcript at 511). Chief Akin testified that incoming boats generally raise their outriggers as they proceed into the channel to avoid impeding traffic in the channel and go directly to the scallop unloading dock/factory for unloading and processing, and he acknowledged that it was unusual for a scallop boat to turn into the turning basin before unloading. (Trial Transcript at 103). The court found that the captain should have proceeded directly to the scallop unloading dock rather than turning into the West Basin, presumptively to seek help from the Coast Guard.

Although Lebet attributed the capsize to overloading, he admitted that the CAPT. BOB could have docked successfully without rolling over. (Trial Transcript at 367). Lebet testified that extended outriggers counteract the rolling of a boat, and that raising the outriggers eliminates this stability advantage and breaks the center of gravity, creating a "perilous condition" in port and making "a major difference" in stability. (Trial Transcript at 302–03). The court found that the CAPT. BOB was *in extremis* when it reached the West Basin and that the captain and crew should not have raised the outriggers in compliance with any Coast Guard regulations, which do not apply to boats *in extremis*. Furthermore, the court found that the CAPT. BOB would not have capsized if the outriggers had remained extended.

Coast Guard Chief Akin was alerted that a boat, yawing side to side, was proceeding into the basin toward the Coast Guard station. When Chief Akin observed the arrival of the CAPT. BOB, he requested a petty

officer to photograph the ship's progress. He noticed that the CAPT. BOB was listing to starboard and that the scallops, piled from the stern to the middle of the ship, were falling into the water.

The CAPT. BOB, according to Akin, made a port turn at the north end of the West Basin in front of the Coast Guard station and headed south toward the scallop unloading dock with the outriggers raised. Based on the testimony of the other eyewitnesses, the court found that the CAPT. BOB made a sweeping starboard turn at the north end of the West Basin. When the CAPT. BOB started this starboard turn, Marchica noted that she appeared to be "very rolly" and "in trouble" with her stern under water and the outriggers raised. (Trial Transcript at 413). Fernandez explained that the captain also used the engine power thrusts "back and forth" in an effort "to counter the instability" of the boat and "to throw" the roll the other way, and "that was only making it worse." (Trial Transcript at 515). The court found that the captain's using the engine to alleviate the list and yawing from side to side aggravated the distressed condition of the boat.

Captain Decker's pictures show that, prior to capsize, the stern of the CAPT. BOB was rolling to the starboard side with water to the cap rail. He testified that the starboard scuppers were underwater and that he detected no water being pumped overboard. The port outrigger was vertical and the starboard outrigger was off center approximately twenty degrees. (Trial Transcript at 28).

The SAR (search and rescue) Incident Summary, required in the case of any marine incident involving civilians, states that the CAPT. BOB requested assistance from the Coast Guard at 0904 hours on May 17, 1988. Eyewitnesses testified that, as the boat rolled starboard, the rigging on the starboard outrigger parted and caused the starboard outrigger to break with a loud noise and to fall into the water. An order came from the Coast Guard boat, which had followed the troubled vessel, for the crew of the CAPT. BOB to jump overboard.

The CAPT. BOB rolled over and capsized starboard at 0910 hours on May 17, 1988, according to the SAR summary. The court found that the vessel capsized because of the breaking of the starboard outrigger.

The SAR report states that the CAPT. BOB capsized because it was "overloaded, scallops on stern." Lieutenant Wigger, however, testified that he had not yet determined the cause of the casualty. Marchica, who has captained loaded scallop boats entering Port Canaveral, routinely observes the boats in that small port, and has worked with the CAPT. BOB, stated that he had seen greater scallop loads on similar vessels than that of the CAPT. BOB on the day that she capsized. (Trial Transcript at 405, 427–28). Based upon his experience in the scalloping business and observation of the subject load, Fernandez testified that the CAPT. BOB had a "profitable" or "nice" scallop load and that he would not have considered the boat overloaded. (Trial Transcript at 506–07). Lebet admitted that the subject load of scallops would not be sufficient to make the deck awash. (Trial Transcript at 395).

Smallwood testified that he had seen the CAPT. BOB loaded with the same, standard load of scallops as the subject load at least twenty-five times. (Trial Transcript at 207, 225). He personally had loaded the boat in excess of 500 gallons of scallop meat, exclusive of shells, and he estimated that the subject load was only 350 gallons. (Trial Transcript at 181–82, 213–14). Smallwood testified that he "always kept the bumper above the water" and that he had admonished Captain Pittman not to overload the boat and to take no chances with the vessel because he had too much money invested in it. (Trial Transcript at 213).

In addition to the size of the load, Marchica explained that the subject scallop load was "clean," or not weighted by trash, fish and sand. (Trial Transcript at 423–24). Fernandez, who also saw the subject scallop load, testified that it was clean, which could be attributed to the lack of rough weather that particular week. (Trial Transcript at 508). The court found that the subject scallop load was clean and that the

CAPT. BOB was not overloaded by the bulk or weight of the scallops it carried when it capsized.

The pictures of the CAPT. BOB as well as the testimony of eyewitnesses support the conclusion that the vessel was unstable with the stern, upon which the scallops were loaded, low in the water, and the bow high. Prior to seeing the CAPT. BOB on the day that she capsized, Fernandez had observed the boat approximately fifty times at Port Canaveral because she operated at the same plant where he had boats. (Trial Transcript at 513). He described the low posture in the water of her deck on the day of the capsize as "very abnormal" and "guaranteed" that she would have had freeboard to the bumper rail if she had not had water in her hold. (Trial Transcript at 512–13). He testified that a sealed, steel-hulled boat, like the CAPT. BOB, can take on water through the propeller shaft or the rudder shaft in the lazaret. (Trial Transcript at 514). Fernandez stated that, if the packing around either the propeller or rudder shaft leaks, then the crew should repack the shaft, "a very simple process that all seamen know about...." (Trial Transcript at 527–28). Fernandez explained that a scallop boat can take on water after it is loaded with scallops because the packing on the rudder shaft is above the water line at preloading, but becomes submerged after loading and can leak water into the lazaret. (Trial Transcript at 526–27).

Lebet admitted that, even with a safe deck-load analysis, it is possible for water to leak into the lazaret through the rudder-shaft tube if the stuffing box is not properly maintained to keep the lazaret watertight. (Trial Transcript at 292–93, 309). He explained that "the lazaret is extremely susceptible to taking on water" in this manner and that water in the stuffing box "almost certainly" comes through the stuffing-box of the rudder tube. (Trial Transcript at 285, 295). Smallwood explained that the lazaret on the CAPT. BOB was a watertight bulkhead and that three to four feet of galvanized pipe encased the rudder post, which entered the hull. (Trial Transcript at 167, 230). Atop that pipe is the packing gland or stuffing box, and Smallwood testified that he had never had a problem with the stuffing box. (Trial Transcript at 230).

Smallwood also testified that the CAPT. BOB had a high-water alarm in the engine room, but no alarms in the fish hold or lazaret. (Trial Transcript at 168–69). Because the CAPT. BOB was designed with a raised stern, water could flow forward from the fish hold to the engine room through a rat hole. (Trial Transcript at 194–95). Given this design of the CAPT. BOB, with rat holes between the fish hold and engine room where the high-water alarm was located, Lebet testified that the "alarm would have definitely gone off had there been water in the fish hold" because the water would flow forward to the engine room. (Trial Transcript at 298). The court found that the CAPT. BOB had taken on substantial water in the lazaret, as opposed to any other below-deck compartment, when she capsized.

Lebet testified that it is "critical" not to have water in a boat because of stability reduction. (Trial Transcript at 268). He stressed that accessibility to the below-deck compartments is essential for water inspection, and that bilge alarms were advisable. Given its watertight bulkhead and absence of a high-water alarm, the lazaret of the CAPT. BOB had to be inspected manually for water and pumped if sufficient water were present. Smallwood explained that this procedure was accomplished by raking the scallops from the lazaret hatch, removing that hatch, and activating the submersible, electric pump in the bilge of the lazaret by attaching the hose below the hatch and utilizing an extension cable plugged into the wheelhouse to provide electricity to pump the water overboard. (Trial Transcript at 204–06, 225–26). He also confirmed that this procedure was not difficult and that to rake the scallops from the lazaret hatch and to remove the hatch would take approximately fifteen minutes. (Trial Transcript at 206, 226).

While Smallwood watched the entry of the CAPT. BOB into the West Basin, he did not see any of the bilge pumps discharging

overboard. (Trial Transcript at 185). Other eyewitnesses to the capsize of the CAPT. BOB also testified that they saw no discharge overboard. The court found that the captain could have raked the scallops from the hatch and checked the lazaret for water when the list occurred and that he had the ability to pump the lazaret, but that he made no attempt to do so.

Smallwood confirmed that, if he had been the captain of the CAPT. BOB on the day of her capsize and had noticed the considerable loss of freeboard from the time of departure from the fishing grounds to arrival at the jetties when the list problem began, then he would have checked for water in the lazaret. (Trial Transcript at 206–07). With these occurrences and the usual scallop load, Smallwood would have known that the boat had water in it. He testified that the captain was "fully responsible" for maintaining the boat and ascertaining whether water was therein. (Trial Transcript at 595). He considered the captain in charge of the boat when it was out and he relied on Captain Pittman routinely to check the lazaret prior to arrival at port. (Trial Transcript at 235, 577–78).

The court found that the subject scallop load was similar to previous loads and that the captain should have known that there was water in the lazaret. The court also found that it was standard procedure to check the lazaret for water during the time that the ship left the fishing grounds until it reached port. Furthermore, the court found that the gradual leaking of a stuffing box before necessary repacking would not have filled the lazaret with enough water to cause a list. Therefore, the court found that there was a failure in the stuffing box on either the rudder or propeller shaft, and that this failure allowed substantial water to enter the lazaret and caused the list.

The CAPT. BOB had not been raised on June 25, 1988, when James C. Harper, marine surveyor, reported to Barnhardt the condition of the insured vessel. Because of the extended period on the harbor bottom, plus likely additional damage from salvage work, Harper stated that the vessel was a probable constructive, total loss. Whereas a constructive, total loss was covered under the subject policy when repairing the vessel would exceed its insured value, Barnhardt presumed that the CAPT. BOB was so declared. (Trial Transcript at 471, 477).

Based upon these facts, the court found that the CAPT. BOB capsized because of the negligence of the captain and crew rather than lack of seaworthiness. Specifically, the court determined that the captain's failing to check the lazaret for water intrusion upon noticing the list and loss of freeboard at the Port Canaveral jetties; his turning into the West Basin instead of going directly to the scallop unloading dock; his activating the engine power thrusts to counter the roll and list of the vessel; and his raising the outriggers, jeopardizing the center of gravity and ultimately causing the capsize because of the breaking of the starboard outrigger, constituted negligence. Therefore, the court found that the CAPT. BOB capsized because of negligence by the captain and crew and that this loss was covered by the Inchmaree clause of the insurance policy issued by plaintiff.

## CONCLUSIONS OF LAW

The court has jurisdiction of this admiralty and maritime case, within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, pursuant to 28 U.S.C. §§ 2201 and 2202. Plaintiff seeks a declaratory judgment that it has no responsibility for insurance coverage for defendants' insured vessel, which capsized in the West Basin at Port Canaveral. Plaintiff claims that, by overloading the CAPT. BOB with scallops, defendants failed to exercise due diligence to keep the vessel seaworthy in violation of the terms and conditions of the policy and, thereby, voided the insurance policy. Defendants contend that they used due diligence at all times to keep the CAPT. BOB seaworthy within the terms of the policy, and that the loss of the boat is covered by the Inchmaree clause of the subject insurance policy. Defendants counterclaimed for the policy limits for the total, constructive loss of the CAPT. BOB as well as interest, costs and attorneys' fees.

The warranty of seaworthiness has been held to mean "that the vessel is reasonably fit for the intended use." *Aguirre v. Citizens Casualty Co.*, 441 F.2d 141, 144 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971); *see Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 339, 75 S.Ct. 382, 384–85, 99 L.Ed. 354 *modified*, 350 U.S. 811, 76 S.Ct. 38, 100 L.Ed. 727 (1955) (judgment amended). Under the American Rule, the insured warrants to the insurer the seaworthiness of the vessel at the inception or attachment of a time policy. *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*, 795 F.2d 940, 945 (11th Cir.1986); *Saskatchewan Government Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385, 388 (5th Cir.1957); *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 983 (5th Cir.1969). Furthermore, the negative, modified warranty of the American Rule is not that the vessel shall continue absolutely to be seaworthy, at the commencement of each voyage or at departure from each port, but "that the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition." *Spot Pack*, 242 F.2d at 388. Unlike the result of voiding the policy upon breaching a warranty of continuing seaworthiness, the consequence of violating this " 'negative' burden" is a denial of liability for loss or damage proximately caused by such unseaworthiness. *Id.; see, e.g., Gulf Coast Trawlers, Inc. v. Resolute Ins. Co.*, 239 F.Supp. 424 (S.D.Tex.1965).

There is no question in this case that the CAPT. BOB was seaworthy at the inception of the subject policy. Furthermore, owner Smallwood credibly testified that he would not allow her to leave port in an unseaworthy condition. Plaintiff/insurer had the dual burdens of proving that the vessel was unseaworthy and that the cause of the unseaworthiness was the proximate cause of the loss. *Spot Pack*, 242 F.2d at 389; *see Hanover Fire Ins. Co. v. Holcombe*, 223 F.2d 844, 846 (5th Cir.), *cert. denied*, 350 U.S. 895, 76 S.Ct. 154, 100 L.Ed. 787 (1955). The court concluded that, not only had plaintiff failed to prove the unseaworthiness of the CAPT. BOB,

but also Lloyd's had failed to show that the subject load of scallops, the alleged cause of this unseaworthiness, was the cause of the capsize and loss of the CAPT. BOB.

The purpose of the Inchmaree clause for captain and crew negligence in a marine insurance policy "is to broaden, not restrict, to expand, not withdraw, coverage" in order to aid the owner, rather than the underwriter. *Spot Pack*, 242 F.2d at 391; *Tropical Marine Prods., Inc. v. Birmingham Fire Ins. Co.*, 247 F.2d 116, 122 (5th Cir.), *cert. denied*, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957); *see Austin v. Servac Shipping Line*, 794 F.2d 941, 946 (5th Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986). A defect, which could have been discovered and which results in unseaworthiness, is covered as the master's negligence as well as a latent defect, which is not discoverable by the master or shipowner. *Tropical Marine*, 247 F.2d at 122. It is uncontroverted in this case that Captain Pittman was the master of the CAPT. BOB while she was out. Based upon the court's findings as to the specific failures in the maneuvering of the CAPT. BOB by the captain and crew under his direction after their awareness of the list obviously caused by water in the lazaret, the court concluded that the vessel capsized because of captain and crew negligence covered by the Inchmaree clause of the subject policy. *See, e.g., Continental Ins. Co. v. Hersent Offshore, Inc.*, 567 F.2d 533 (2d Cir.1977); *Joseph Navigation Corp. v. Chester*, 411 F.Supp. 496 (S.D.N.Y.1975), *aff'd mem.*, 556 F.2d 557 (2d Cir. 1976); *Carter Tug Serv., Inc. v. Home Ins. Co.*, 345 F.Supp. 1193 (S.D.Ill.1971).

The court not only concluded that the capsize of the CAPT. BOB was the result of captain and crew negligence, encompassed by the Inchmaree clause of the subject insurance policy, but also that the evidence and testimony showed that the vessel was a constructive, total loss, warranting full recovery under the subject policy. Therefore, the court awarded defendants the entire amount for which the CAPT. BOB was insured, or $175,000.00, which plaintiff/insurer bound itself to pay. *See Kansas City Fire & Marine Ins. Co. v.*

*Keith,* 284 F.2d 944, 945 (5th Cir.1960) (per curiam). It is well settled that the court had discretion to award defendants prejudgment interest at 12% from May 17, 1988, the date of the loss of the CAPT. BOB, until judgment was entered on April 19, 1989. *Kilpatrick Marine,* 795 F.2d at 948; *see Steelmet, Inc. v. Caribe Towing Corp.,* 842 F.2d 1237, 1243–44 (11th Cir. 1988); *see also United States Fire Ins. Co. v. Cavanaugh,* 732 F.2d 832, 834–35 (11th Cir.) (affirming award of 12% prejudgment interest), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984).

■ The court also awarded defendants, as the prevailing party, statutory postjudgment interest on the $175,000.00 policy-limit amount and costs. 28 U.S.C. § 1961; Fed.R.Civ.P. 54(d); *see Steelmet,* 842 F.2d at 1244–45; *Gele v. Wilson,* 616 F.2d 146, 148 (5th Cir.1980); *Mobil Oil Corp. v. Tug Pensacola,* 472 F.2d 1175, 1176 (5th Cir.1973) (per curiam); *Ore Carriers of Liberia, Inc. v. Navigen Co.,* 305 F.Supp. 895, 897 (S.D.N.Y.1969), *aff'd,* 435 F.2d 549 (2d Cir.1970) (per curiam). Under applicable Florida law, plaintiff/insurer was obligated to pay defendants under the subject policy when its liability was adjudged upon the entry of judgment. *Steelmet,* 842 F.2d 1244–45; *see Stuyvesant Ins. Co. v. Bournazian,* 342 So.2d 471, 473 (Fla.1977). Although the court has held that the policy limit is owed defendants for the constructive, total loss of the CAPT. BOB, plaintiff/insurer also must pay interest on the $175,000.00, which it was obligated to pay as of April 19, 1989. *Steelmet,* 842 F.2d at 1244–45.

### ATTORNEYS' FEES

■ Attorneys' fees generally are not awarded in admiralty cases. *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel, Her Cargo, Apparel, Tackle, & Furniture,* 695 F.2d 893, 905 (5th Cir.), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). Based upon the lack of complexity of the legal issues and discovery involved in this case; the experience of the counsel, who specialize in admiralty litigation; and the award to defendants of the policy-limit amount, prejudgment interest, postjudgment interest and costs; the court did not award attorneys' fees to defendants' counsel for preparation for and conduct of the trial in this case. Following the entry of judgment and pursuant to Fla.Stat. § 627.428 (1987), defendants have filed an attorneys' fees motion with supporting affidavits. This statute, providing that an insured who prevails against an insurer is entitled to reasonable attorneys' fees on appeal, has been held applicable to federal courts in Florida. Fla.Stat. § 627.428(1); *Steelmet,* 842 F.2d at 1245; *Blasser Bros., Inc. v. Northern Pan-American Line,* 628 F.2d 376, 386 (5th Cir.1980). Because this case is on appeal to the Eleventh Circuit Court of Appeals and determination of appellate attorneys' fees is premature, the court DEFERS ruling on defendants' motion for attorneys' fees until the appeal has been decided by the Eleventh Circuit.

■ Plaintiff has moved to strike defendants' supporting affidavits accompanying their motion for attorneys' fees since these attorneys, knowledgeable as to fees charged and preparation time expended in connection with admiralty litigation, were not listed as witnesses in the pretrial stipulation. Because defendants' motion for attorneys' fees has been filed post-trial and because the affidavits of these admiralty attorneys, one of whom was defendants' trial counsel, would be useful in deciding reasonable attorneys' fees, plaintiff's motion to strike these affidavits is DENIED.

In summary, the court awarded defendants the policy-limit amount of $175,-000.00 for the constructive, total loss of the CAPT. BOB, with prejudgment interest, postjudgment interest, and costs, but not attorneys' fees. The court has deferred ruling on defendants' motion for attorneys' fees pursuant to Fla.Stat. § 627.428 until disposition of the appeal by the Eleventh Circuit and has denied plaintiff's motion to strike affidavits supporting defendants' motion for attorneys' fees.

It is SO ORDERED.